# IN THE SUPREME COURT OF IOWA

No. 20–1568

Submitted October 8, 2021—Filed April 22, 2022

**STATE OF IOWA,**

Appellee,

vs.

**BRENT ALAN HAUGE,**

Appellant.

Appeal from the Iowa District Court for Plymouth County, Daniel P. Vakulskas, District Associate Judge.

The defendant challenges his conviction for possession of methamphetamine, second offense, in violation of Iowa Code section 124.401(5), arguing he was subjected to an impermissible search. **AFFIRMED.**

Christensen, C.J., delivered the opinion of the court, in which Waterman, Mansfield, McDonald, Oxley, and McDermott, JJ., joined. Appel, J., filed a dissenting opinion.

Martha J. Lucey, State Appellate Defender, and Ashley C. Stewart (argued), Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, Thomas E. Bakke (argued), Assistant Attorney General, for appellee.

**CHRISTENSEN, Chief Justice.**

Late one summer night, three friends went for a ride in a two-door vehicle and headed out on the highway to look for adventure in whatever came their way. Little did they know that adventure for the three friends—a speeding driver, a back-seat passenger with an outstanding arrest warrant, and a front-seat passenger—would result in the arrest of both passengers when law enforcement officers stopped their two-door vehicle for speeding around 10:30 p.m. along Highway 75. One officer talked to the driver and the other officer went to the passenger side to talk to the front- and back-seat passengers. Instead of acknowledging the officer shining his flashlight into the passenger-side window right next to him, the front passenger stared straight ahead "like a statue" and then proceeded to use the light from the officer's flashlight to retrieve a lottery ticket from the door holder and examine it. The front passenger initially resisted giving the officer his identification, but both passengers eventually provided that information, which led the officers to discover the back-seat passenger had a warrant for her arrest relating to a conviction for domestic abuse assault with a weapon.

To safely effectuate the arrest of the back-seat passenger, the officers asked the driver and front passenger to exit the two-door vehicle so the back-seat passenger could exit. Once the front passenger exited the vehicle, one of the officers asked him if he had any weapons on him, to which the passenger responded he did not, and then the officer asked him if he could "check [him] for weapons real quick." The passenger responded, "Yup," and the officer's pat-down

revealed a methamphetamine pipe and a baggie containing methamphetamine, leading to the passenger's criminal charge of possession of methamphetamine, second offense, in violation of Iowa Code section 124.401(5) (2019), an aggravated misdemeanor.

The passenger moved to suppress all evidence obtained after the exit order, arguing law enforcement acted unreasonably under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution by ordering him out of the vehicle. He also claimed his consent to the pat-down was not voluntary under article I, section 8 of the Iowa Constitution because the officer did not inform him that he could decline the search. The district court denied the motion to suppress and later convicted the passenger. We affirm the district court judgment because the officer's order for the passenger to exit the vehicle was necessary to facilitate the lawful arrest of the back-seat passenger. Further, consistent with federal precedent and the vast majority of states, we hold there is no requirement under the Iowa Constitution that subjects of a search must be informed of their right to decline the search in order for their consent to be voluntary. We affirm the district court's conclusion that the passenger's consent was voluntary based on the totality of the circumstances.

**I. Background Facts and Proceedings.**

Around 10:30 p.m. on June 14, 2019, Brent Hauge was a front-seat passenger in a two-door vehicle when Officer Colin Scherle of the Merrill Police Department stopped the vehicle for speeding along Highway 75 in Plymouth County, Iowa. Deputy Kyle Petersen of the Plymouth County Sheriff's

Department was driving in the area and stopped to assist Officer Scherle with the traffic stop. Officer Scherle's dash camera captured the stop, though it is difficult to hear most of the officers' conversation with the vehicle's occupants. As Officer Scherle approached the driver's side to talk to the driver, Deputy Petersen approached the passenger's side. Deputy Petersen used his flashlight to see all of the occupants and observed Hauge in the front passenger seat and a female in the back seat. Hauge did not initially acknowledge Deputy Petersen's presence, staring straight ahead "like a statue" instead and then reaching into the passenger door holder to pull out what appeared to be a lottery ticket. Hauge held the lottery ticket up, using the light from Deputy Petersen's flashlight to view it, then placed it back in the door holder. After returning the lottery ticket to the door holder, Hauge began to stare straight down at the floor and continued to avoid eye contact with Deputy Petersen.

Deputy Petersen asked the passengers for their identification information, and Hauge responded by asking if he was being detained. Deputy Petersen explained he was not being detained, and Hauge provided Deputy Petersen with his identification card. Deputy Petersen also retrieved the back-seat passenger's information and then worked with Officer Scherle to check the license and warrant status of all three occupants. Upon discovering the back-seat passenger had a warrant for her arrest due to an overdue mittimus relating to a conviction for domestic abuse assault with a weapon, the officers decided to ask the occupants to exit the two-door vehicle so they could safely arrest the back-seat passenger.

When Deputy Petersen ordered Hauge to exit the vehicle, Hauge did not immediately exit and asked if he was being detained. Deputy Petersen informed Hauge that he was being detained and again asked Hauge to exit the vehicle. Hauge exited the vehicle and Deputy Petersen asked Hauge if he had any weapons, to which Hauge indicated that he did not. Deputy Petersen subsequently asked Hauge if it was okay to "check [him] for weapons real quick." Hauge swiftly responded, "Yup," and set the soda he was holding down so Deputy Petersen could perform the pat-down.

During the pat-down, Deputy Petersen felt an object "bulging out of [Hauge's] pocket," which he believed was a methamphetamine pipe based on the object's "size and length" and his training and experience. When Deputy Petersen went to retrieve the object from Hauge's pocket, he discovered a methamphetamine pipe and what was later confirmed to be a baggie containing methamphetamine. The State charged Hauge with possession of methamphetamine, second offense, in violation of Iowa Code section 124.401(5), an aggravated misdemeanor.

Hauge moved to suppress all evidence obtained during the search and seizure, arguing law enforcement obtained it illegally in violation of his rights under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. Hauge argued that the officers lacked reasonable suspicion to order him out of the vehicle or to believe Hauge was armed or dangerous to justify the pat-down and that Hauge's consent to the pat-down was not voluntary. During the hearing, Deputy Petersen testified that he

initially became suspicious of Hauge when Hauge did not make any attempt to acknowledge Deputy Petersen and focused instead on a lottery ticket after Deputy Petersen approached the vehicle. Deputy Petersen explained, "Through my training, experience, and knowledge I've noticed that individuals that don't want to make eye contact, don't want to engage in any conversation, things of that nature, maybe more nervous around people, typically could potentially have criminal activity afoot." Deputy Petersen noted that it struck him as "very odd" that Hauge retrieved the lottery ticket from the door holder and used Deputy Petersen's flashlight to view the ticket, reasoning, "It mean[t] to me that he recognized my presence at the stop but didn't, once again, want to make contact with me or eye contact or anything of that nature, which, once again, raised red flags."

Deputy Petersen discussed various reasons for ordering Hauge out of the vehicle, including the nature of the back-seat passenger's conviction for domestic abuse with a weapon, Hauge's furtive movements of reaching into the door holder out of Deputy Petersen's eyesight multiple times, his choice not to acknowledge Deputy Petersen's presence, and his resistance to provide his identification. He expressed similar concerns when testifying about why he believed Hauge had weapons on him. Officer Scherle also testified about the safety concerns that led to the exit order. He acknowledged that the back-seat passenger could have exited the driver's side of the two-door vehicle but believed that it was safer to exit through the passenger side door where Hauge was seated. The video shows

that the car was pulled over on the shoulder of a busy highway (U.S. 75) just slightly off the roadway.[1]

The district court denied Hauge's motion to suppress the evidence of the methamphetamine pipe and methamphetamine. Although the district court concluded Deputy Petersen did not have reason to believe Hauge was armed to justify the pat-down under the officer-safety exception to the warrant requirement, it reasoned the pat-down was allowed because Hauge voluntarily consented to it. It also determined the scope of the pat-down search was lawful under the plain-feel exception because the identity of the object in Hauge's pocket was immediately apparent during the pat-down. During Hauge's bench trial, he orally moved the district court to reconsider its ruling on his motion to suppress. In its written verdict, the district court denied Hauge's motion to reconsider and found Hauge guilty of possession of methamphetamine, second offense, in violation of Iowa Code section 124.401(5), an aggravated misdemeanor. Hauge appealed, and we retained the appeal.

## II. Standard of Review.

"When a defendant challenges a district court's denial of a motion to suppress based upon the deprivation of a state or federal constitutional right,

---

[1]Hauge also challenged the validity of the traffic stop in his motion to suppress, but he withdrew that challenge at the conclusion of the suppression hearing. He amended the motion to suppress at the conclusion of the hearing to claim that he was subject to a custodial interrogation after he was put in handcuffs and that Deputy Petersen asked him what the object in his pocket was. The district court concluded Hauge was subject to a custodial interrogation without being provided his *Miranda* rights and granted Hauge's motion to suppress concerning his answer to the object's identity, though it was not clear from the evidence how Hauge responded. The State does not challenge that ruling on appeal.

our standard of review is de novo." *State v. Brown*, 930 N.W.2d 840, 844 (Iowa 2019) (quoting *State v. Brown*, 890 N.W.2d 315, 321 (Iowa 2017)). We review the entire record to independently evaluate the totality of the circumstances and examine each case "in light of its unique circumstances." *Id.* (quoting *State v. Kurth*, 813 N.W.2d 270, 272 (Iowa 2012)). In doing so, "[w]e give deference to the district court's fact findings due to its opportunity to assess the credibility of the witnesses, but we are not bound by those findings." *Brown*, 890 N.W.2d at 321 (quoting *In re Prop. Seized from Pardee*, 872 N.W.2d 384, 390 (Iowa 2015)).

**III. Analysis.**

Hauge raises two issues on appeal. First, he contends the district court erred in denying his motion to suppress the evidence obtained from Deputy Petersen's warrantless search and seizure because Deputy Petersen lacked justification to order him out of the vehicle. Second, Hauge maintains his consent to the pat-down was not voluntary.

**A. Deputy Petersen's Authority to Order Hauge Out of the Vehicle.** On appeal, Hauge acknowledges the initial stop of the vehicle was valid due to the driver's traffic violation, and the State does not contest Hauge's claim that he was seized during the traffic stop under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. *See, e.g., State v. Warren*, 955 N.W.2d 848, 859 (Iowa 2021) ("The '[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of' the Fourth Amendment." (alteration in original) (quoting *Whren*

*v. United States*, 517 U.S. 806, 809–10 (1996))). The parties also agree that Deputy Petersen's order for Hauge to exit the vehicle was lawful under the Fourth Amendment. Nevertheless, they disagree about whether Deputy Petersen had the authority to order Hauge out of the vehicle under article I, section 8 of the Iowa Constitution.[2] Hauge asks us to interpret article I, section 8 of the Iowa Constitution more broadly than the Fourth Amendment to the United States Constitution. Specifically, he urges us to apply our 1990 holding in *State v. Becker*, 458 N.W.2d 604 (Iowa 1990), *abrogated on other grounds by Knowles v. Iowa*, 525 U.S. 113 (1998), under the Iowa Constitution so that an officer cannot order a passenger out of the vehicle during a lawful traffic stop "unless some articulable suspicion exists concerning a violation of law by that person, or unless further interference with the passenger is required to facilitate a lawful arrest of another person or lawful search of the vehicle." *Id.* at 607.

In *Becker*, we concluded a state trooper violated a vehicle passenger's Fourth Amendment rights by ordering the passenger from the vehicle. *Id.* at 607–08. We reasoned there were different interests in privacy rights and officer safety concerning the driver and passenger, noting a person in the driver's position who is "known to the officer to have violated the traffic laws" is

---

[2]In addition to challenging Hauge's argument on the merits, the State argues Hauge failed to preserve error on this claim because he never challenged the lawfulness of the officer's exit order in his motion to suppress. We conclude the issue was at least minimally preserved because the district court declared in its ruling on Hauge's motion to suppress that "it was reasonable for the officers to ask the Defendant to exit the vehicle to allow them to gain access to the [backseat passenger], as it was a two door vehicle." *See Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002) ("The claim or issue raised does not actually need to be used as the basis for the decision to be preserved, but the record must at least reveal the court was aware of the claim or issue and litigated it.").

"technically subject to full custodial arrest" and law enforcement's intrusion into the driver's privacy is justified. *Id.* at 607. In contrast, "[t]he resulting intrusion on the passenger which flows from the initial stop is an unavoidable consequence of action justifiably taken against the driver." *Id.* Thus, we held, "Further intrusion on the passenger is not justified . . . unless some articulable suspicion exists concerning a violation of law by that [passenger], or unless further interference with the passenger is required to facilitate a lawful arrest of another person or lawful search of the vehicle." *Id.* Because "there was no articulable suspicion of wrongdoing on [the passenger's] part or any need to move him in order to facilitate arrest of the driver or search of the vehicle," the evidence obtained after the state trooper ordered the passenger from the car required suppression. *Id.* at 607–08. *Becker* only interpreted the issue under the Fourth Amendment, and the United States Supreme Court later overruled this decision in *Maryland v. Wilson,* 519 U.S. 408 (1997), when it held an officer may order a vehicle passenger out of the vehicle during the course of a routine traffic stop for any reason regardless of whether the officer has reason to suspect foul play or anything problematic about the passenger. *Id.* at 414–15.

We need not address Hauge's request for us to depart from federal precedent by applying the heightened standard established in *Becker* under the Iowa Constitution because Deputy Petersen was authorized to order Hauge out of the vehicle even under that heightened standard that Hauge requests in order to facilitate the lawful arrest of the back-seat passenger. The back-seat passenger had an active arrest warrant for a conviction involving a dangerous

weapon, and she could not exit the two-door vehicle unless the driver or passenger exited the vehicle. Although Deputy Petersen technically could have only ordered the driver to exit so that the back-seat passenger could exit from the driver's side, it is reasonable for him to ask the front-seat passenger to exit instead because of safety concerns. In particular, the vehicle was stopped late at night alongside the highway with the driver's-side door facing the lane of oncoming traffic. Meanwhile, the passenger-side door where Hauge was located presented the safer option because it allowed the back-seat passenger to exit toward the highway's shoulder and avoid potentially stumbling into oncoming traffic.

"[C]onstitutional search and seizure provisions do not require the least intrusive action possible. Instead, they require a measure of 'reasonableness, under all the circumstances.' " *State v. Jones*, 666 N.W.2d 142, 149 (Iowa 2003) (citations omitted). Allowing officers to exercise command of the situation minimizes the risk of harm to law enforcement officers and the vehicle occupants alike. *Wilson*, 519 U.S. at 414–15. Here, it was reasonable for the officers to avoid putting the safety of the exiting back-seat passenger at risk when they asked Hauge to step out of the vehicle for the back-seat passenger to exit instead of requiring the back-seat passenger to exit into oncoming traffic.

As we held in *Becker*, further intrusion of the passenger is justified if it "is required to facilitate a lawful arrest of another person." 458 N.W.2d at 607. This is exactly what happened here, and thus, Deputy Petersen did not violate

Hauge's constitutional right under article I, section 8 when he ordered Hauge out of the vehicle.

**B. The Voluntariness of Hauge's Consent.** Hauge argues his consent to the pat-down was involuntary because the officers never advised him of his right to decline consent. In doing so, Hauge asks us to depart from federal precedent to adopt a knowing-and-voluntary standard for consensual searches and seizures under article I, section 8 that requires law enforcement to expressly advise individuals of their right to decline to consent to a search. Alternatively, Hauge argues that his consent was involuntary even if we decline to adopt his requested knowing-and-voluntary standard because the totality of the circumstances shows his consent to the pat-down was the product of coercion.

1. *Error preservation.* The State contests error preservation on Hauge's request for us to adopt a per se requirement that officers advise an individual of their right to decline a search under the Iowa Constitution to establish the voluntariness of consent. According to the State, this argument was neither raised nor ruled upon below and Hauge's passing reference to the Iowa Constitution is inadequate to preserve error for this argument. Hauge maintains he preserved error through the district court's denial of his motion to suppress.

> When there are parallel constitutional provisions in the federal and state constitutions and a party does not indicate the specific constitutional basis, we regard both federal and state constitutional claims as preserved . . . . Even in these cases in which no substantive distinction has been made between state and federal constitutional provisions, we reserve the right to apply the principles differently under the state constitution compared to its federal counterpart.

*State v. Gaskins*, 866 N.W.2d 1, 6 (Iowa 2015) (omission in original) (quoting *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011)). Hauge cited the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution in his motion to suppress and argued his consent was not voluntary under these provisions. The district court's suppression ruling does not cite the federal or state constitutional provision in denying Hauge's motion, though it cites to both federal and state precedent and its reasoning shows it analyzed the constitutional issues presented. *See Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012) ("If the court's ruling indicates that the court *considered* the issue and necessarily ruled on it, even if the court's reasoning is 'incomplete or sparse,' the issue has been preserved." (quoting *Meier v. Senecaut*, 641 N.W.2d 532, 540 (Iowa 2002))). Under our lenient rules of error preservation, this was adequate for Hauge to preserve his argument under the Iowa Constitution.

2. *Establishing consent to search.* Hauge asks our court to depart from federal precedent to adopt a heightened standard for consensual searches and seizures under article I, section 8 of the Iowa Constitution. Alternatively, he claims his consent was not voluntary under our existing standard analyzing consensual searches under the totality of the circumstances.

Article I, section 8 of the Iowa Constitution provides,

The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Evidence obtained in violation of this provision is inadmissible. *Warren*, 955 N.W.2d at 859. The warrant requirement is the fundamental protection against unreasonable searches and seizures. *State v. Reinier*, 628 N.W.2d 460, 464 (Iowa 2001) (en banc). Nevertheless, consensual searches are a well-established exception to the warrant requirement and do not violate the Federal or State Constitution. *Id.* at 464–65; *see also State v. Reinders*, 690 N.W.2d 78, 82 (Iowa 2004) (concluding there was no basis to distinguish the protections afforded by the Iowa Constitution from those afforded by the United States Constitution concerning consensual searches).

The federal precedent governing consent searches under the Fourth Amendment is *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). There, the United States Supreme Court considered what the prosecution must prove to demonstrate an individual "voluntarily" consented to a search. *Id.* at 223. The Court declined to adopt a per se rule that an individual must have knowledge of the right to refuse consent in order for the consent to be "voluntary" under the Fourth Amendment, explaining, "[K]nowledge of the right to refuse consent is one factor to be taken into account, [but] the government need not establish such knowledge as the sine qua non of an effective consent." *Id.* at 227. The Court declared, "[T]he near impossibility of meeting this prosecutorial burden suggests why this Court has never accepted any such litmus-paper test of voluntariness." *Id.* at 230. It acknowledged one alternative to proving a subject knew of the right to refuse would be to advise the subject of that right before eliciting consent, as Hauge urges us to require under the Iowa Constitution. *Id.* at 231. But it rejected

that alternative, stressing that consent searches "normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions" that "are a far cry from the structured atmosphere of a trial where, assisted by counsel if he chooses, a defendant is informed of his trial rights." *Id.* at 232. Further, the Court articulated that "these situations are still immeasurably, far removed from 'custodial interrogation' where, in *Miranda v. Arizona*, we found that the Constitution required certain now familiar warnings as a prerequisite to police interrogation." *Id.* (citation omitted).

Likewise, the Court rejected the argument Hauge makes here that consent to search should be treated like a waiver of a trial right, as the right to counsel was treated in *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938), in which the Supreme Court held the waiver of that right requires the State to demonstrate "an intentional relinquishment or abandonment of a known right or privilege." *Schneckloth*, 412 U.S. at 243–45. The Court frankly proclaimed, "Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures" because the protections of the Fourth Amendment "have nothing whatever to do with promoting the fair ascertainment of truth at a criminal trial." *Id.* at 241, 242. "The guarantees of the Fourth Amendment stand 'as a protection of quite different constitutional values—values reflecting the concern of our society for the right of each individual to be let alone.' " *Id.* at 242 (quoting *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 416 (1966)). Ultimately, the court

held that "whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances" and the individual's knowledge of the right to refuse is but one factor to consider among all the circumstance's. *Id.* at 227.

For decades, we analyzed the validity of an individual's consent in search and seizure cases under the Fourth Amendment precedent established in *Schneckloth. See State v. Pals*, 805 N.W.2d 767, 779–80 (Iowa 2011) (citing numerous consensual search cases from our court dating back to 1975 that did not depart from federal precedent). In *State v. Reinders*, we examined the validity of a defendant's consent to a search of his person and confirmed there was "no basis to distinguish the protections afforded by the Iowa Constitution from those afforded by the federal constitution under the facts of [the] case." 690 N.W.2d at 82. In interpreting article I, section 8 coextensive with the Fourth Amendment, we have recognized certain factors that the court *may* consider in determining whether the prosecution met its burden to prove the consent was voluntary with no one factor being determinative. *State v. Lane*, 726 N.W.2d 371, 378 (Iowa 2007). These factors include

> *personal characteristics* of the [consenter], such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of the detention or questioning, the substance of any discussion between the [consenter] and police preceding the consent, whether the [consenter] was free to leave or was subject to restraint, and whether the [consenter's] contemporaneous reaction to the search was consistent with consent.

*Id.* (alterations in original) (quoting *United States v. Va Lerie*, 424 F.3d 694, 709 (8th Cir. 2005)).

More recently in *State v. Pals*, a majority of our court criticized the federal approach to consensual searches, noting four states have adopted a heightened knowing-and-voluntary standard to analyze the voluntariness of an individual's consent and "[t]he academic commentary on [the federal approach] has been generally unfavorable." 805 N.W.2d at 779, 781–82. Yet, we declared, "An evaluation of such a per se requirement that police advise an individual of his or her right to decline to consent to a search . . . is reserved for another day." *Id.* at 782. Instead, the majority applied "an Iowa version of the [federal] 'totality of the circumstances' test," *id.*, purportedly "insist[ing] on a more realistic analysis of what amounts to 'voluntary consent,'" *State v. Baldon*, 829 N.W.2d 785, 823 (Iowa 2013) (Appel, J., specially concurring) (citing *Pals*, 805 N.W.2d at 782–83).

A few months later, in *State v. Lowe*, we again did not adopt a per se requirement that law enforcement must advise individuals of their right to refuse a search. 812 N.W.2d 554, 572–75 (Iowa 2012). In a separate opinion, Justice Appel, who authored the *Pals* majority opinion, specifically explained that the "*Schneckloth*-type-totality-of-the-circumstances test" adopted in *Pals* does not hold the failure to inform a suspect of the right to refuse consent is dispositive. *Id.* at 589 (Appel, J., concurring in part and dissenting in part). Hauge relies on the criticisms of *Schneckloth* that the majority discussed in *Pals* in urging us to now adopt a knowing-and-voluntary standard to analyze the voluntariness of an

individual's consent, which would require law enforcement to advise an individual of the right to refuse a search.

In asking us to depart from federal precedent to adopt a per se requirement that law enforcement must advise individuals of their right to refuse consent under the Iowa Constitution, Hauge is also asking us to overturn our article I, section 8 precedent. We have long interpreted article I, section 8 coextensive with the Fourth Amendment in analyzing consent searches. *See, e.g., Reinders*, 690 N.W.2d at 82. Even in proclaiming to use a "more realistic analysis" than the federal precedent to examine the totality of the circumstances in *Pals*, we examined the totality of the circumstances in a manner similar to that used by the Supreme Court in *Schneckloth*: with no one factor being determinative of the outcome. *Baldon*, 829 N.W.2d at 823; *see also Pals*, 805 N.W.2d at 782–83. We also applied a totality-of-the-circumstances test a few months later in *Lowe*, reiterating, "The question of voluntariness requires the consideration of many factors, although *no one factor itself may be determinative*." 812 N.W.2d at 572 (majority opinion) (emphasis added). "Though it is 'our role as a court of last resort . . . to occasionally reexamine our prior decisions, we must undertake this weighty task only for the most cogent reasons and with the greatest caution.' " *Brown*, 930 N.W.2d at 854 (omission in original) (quoting *Kiesau v. Bantz*, 686 N.W.2d 164, 180 (Iowa 2004) (Cady, J., dissenting), *overruled on other grounds by Alcala v. Marriott Int'l Inc.*, 880 N.W.2d 699, 708 n.3 (Iowa 2016)). We are not persuaded that those reasons exist in this situation.

The four states that Hauge relies on for departure—Arkansas, Mississipi, New Jersey, and Washington—are outliers on this issue. *See Pals*, 805 N.W.2d at 779. The overwhelming majority of other states continue to follow *Schneckloth* and many that have been asked to adopt Hauge's proposed per se requirement as a matter of state constitutional law have rejected it. *See, e.g., State v. Flores*, 185 P.3d 1067, 1070–71 (N.M. Ct. App. 2008) (collecting cases of states that have rejected a per se requirement); *Commonwealth v. Cleckley*, 738 A.2d 427, 432 (Pa. 1999) ("Those states that have addressed this issue, however, have, for the most part, rejected the notion that knowledge of one's right to refuse consent to a warrantless search is required under the applicable state constitution, opting instead to follow the federal voluntariness standard which focuses on the totality of the circumstances as opposed to any one factor."). That the majority of other states have analyzed this issue and declined to depart from the federal standard speaks to the persuasiveness of the federal standard. *Cf. Gaskins*, 866 N.W.2d at 33 (Appel, J., concurring specially) ("What is critical with state constitutional precedents in other states, as with all cited authority, is the underlying persuasive power of the reasoning.").

Further, the leading case for adopting Hauge's per se requirement, *State v. Ferrier*, 960 P.2d 927, 932–33 (Wash. 1988), is based on what we have described time and again as a "substantially different search and seizure provision of the Washington Constitution." *Brown*, 930 N.W.2d at 853; *see also State v. Storm*, 898 N.W.2d 140, 153 (Iowa 2017) ("Washington's constitution also contains an express right to privacy. The Washington Supreme Court relied

on that privacy provision to require exigency. The Iowa Constitution lacks a separate privacy provision." (citations omitted)). Even many of those states that have an explicit right to privacy provision in their state constitution have rejected the argument that law enforcement must inform individuals of their right to refuse consent to search. *See State v. Forrester*, 541 S.E.2d 837, 841 (S.C. 2001) ("Eight of the nine other states that have an explicit right to privacy provision contained in their constitution have rejected Forrester's argument that suspects must be informed of their right to refuse consent to search."). Moreover, two of the four states that Hauge cites for support have not gone so far as to adopt a per se requirement that law enforcement must advise an individual of the right to refuse a search; rather, they only require a showing that the consenting individual was aware of the right to refuse consent. *See Graves v. State*, 708 So. 2d 858, 864 (Miss. 1997) (en banc); *State v. Johnson*, 346 A.2d 66, 68 (N.J. 1975). Overall, there is nothing compelling in the states Hauge cites that merits our departure from federal precedent in this case.

Additionally, Hauge's test is unworkable and contradicts the need to "balance[] the competing interests of legitimate and effective police practices against our society's deep fundamental belief that the criminal law cannot be used unfairly." *Lowe*, 812 N.W.2d at 572; *see also Welch v. Iowa Dep't of Transp.*, 801 N.W.2d 590, 601 (Iowa 2011) ("Law enforcement officials have to make many quick decisions as to what the law requires where the stakes are high, involving public safety on one side of the ledger and individual rights on the other."). Consent searches are a valuable law enforcement tool that protects the security

of all. *See Schneckloth*, 412 U.S. at 225 ("Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished."). "To approve such searches without the most careful scrutiny would sanction the possibility of official coercion; to place artificial restrictions upon such searches"—as Hauge asks us to do—"would jeopardize their basic validity." *Id.* at 229.

We have already discussed the differences between search and seizure rights and trial rights as well as the problems with Hauge's per se requirement in our discussion of *Schneckloth*. In short, requiring an officer to inform the subject of a search of the right to refuse can be summarized as impractical and unrealistic. Consent searches are usually conducted by law enforcement officers in unstructured environments, like alongside Highway 75 in this case. *Id.* at 232. "It would be unrealistic to expect that in the informal, unstructured context of a consent search, a policeman, upon pain of tainting the evidence obtained, could make the detailed type of examination demanded by *Johnson*"—"an examination that was designed for a trial judge in the structured atmosphere of a courtroom." *Id.* at 244, 245. Any rule requiring the State to prove the subject of the search knew they had the right to refuse consent—whether that requires a per se requirement that law enforcement inform the subject of this right or not—"would, in practice, create serious doubt whether consent searches could continue to be conducted." *Id.* at 229. We should "not handicap our police by imposing a de facto requirement to give such a warning [that the subject can refuse consent]

during pedestrian *Terry* stops or routine traffic stops." *Pals*, 805 N.W.2d at 789 (Waterman, J., dissenting).

Further, despite the academic criticism of *Schneckloth* that Hauge cites from the majority opinion in *Pals*, Hauge offers no insight into how his proffered approach will alleviate those concerns. Critics of *Schneckloth* focus primarily on the lack of clarity and predictability in the *Schneckloth* test and question whether a per se requirement that officers must warn individuals of their right to refuse would actually "be an unreasonable burden on law enforcement." *Id.* at 781–82 (majority opinion). If anything, law enforcement's increased use of body and dash camera technology strengthens the case for the *Schneckloth* test because the availability of that video makes it easier for courts to analyze the totality of the circumstances by viewing the actual record of what happened in reviewing a motion to suppress. We had it in this case, for example.

Hauge's proposed rule only works in one direction: "If the advice was not given, then the search is invalid. If it was given, the search could still be invalid if the consent is shown to be involuntary for some other reason." *Lowe*, 812 N.W.2d at 582 (Waterman, J., concurring specially). Thus, in those situations when the officer informs individuals that they are free to refuse the search and those individuals consent anyway, courts are still left to engage in this allegedly unclear and unpredictable totality-of-the-circumstances analysis. It also creates a new form of unpredictability "resulting from the break with Iowa and federal search and seizure precedent and the lack of clarity over how far the new advance warning requirement would be extended in future cases." *Id.*

Moreover, Hauge has offered no information to suggest creating a new per se requirement that officers must advise individuals of their right to refuse consent is not an unreasonable burden on law enforcement as some critics of *Schneckloth* maintain. We have no information from law enforcement about the practicality of implementing this requirement in Iowa, but it is also not our role to change the laws governing law enforcement policy when existing policies are constitutional because we leave policy decisions to the legislature. *Brown,* 930 N.W.2d at 849 ("[I]t is our job to interpret the Iowa Constitution and not to set policy for the State of Iowa."). "Our elected legislature, in its wisdom, can impose by statute a requirement that police tell drivers they have a right to say no and go when asked for permission to search the vehicle." *Pals,* 805 N.W.2d at 788–89 (Waterman, J., dissenting). But we do not reinterpret our state constitution simply because there may be benefits to using a different law enforcement practice.

We also do not reinterpret our state constitution merely because the doctrine at issue is subject to academic criticism. Like virtually every other concept of search and seizure jurisprudence, academic scholars disagree on the merits of consent searches and some scholars advocate for consent searches and highlight the doctrine's merits. *See, e.g.*, Daniel R. Williams, *Misplaced Angst: Another Look at Consent-Search Jurisprudence,* 82 Ind. L.J. 69, 91–94 (2007); Note, *The Fourth Amendment and Antidilution: Confronting the Overlooked Function of the Consent Search Doctrine,* 119 Harv. L. Rev. 2187, 2197 (2006).

"[W]e do not make our determination by a majoritarian numbers game." *Gaskins*, 866 N.W.2d at 33.

In conclusion, nothing Hauge argues justifies disregarding decades worth of Iowa precedent employing a totality-of-the-circumstances test to analyze consent searches or that a departure from federal precedent is necessary under article I, section 8 of the Iowa Constitution. Accordingly, there is no per se requirement to inform individuals that they are free to refuse consent to a search or to show that individuals knew they had the right to refuse consent. Deputy Petersen did not violate Hauge's constitutional right under article I, section 8 when he did not inform Hauge that he could decline the request to search.

3. *Whether Hauge's consent was voluntary under our existing caselaw.* Hauge contends his consent was involuntary under the "Iowa version" of the *Schneckloth* totality-of-the-circumstances test that a majority of the court adopted in *Pals.* 805 N.W.2d at 782–83 (majority opinion). There, a law enforcement officer conducted a traffic stop of Pals to enforce a municipal ordinance. *Id.* at 770. When Pals was unable to produce proof of insurance, the officer asked Pals to come back to his patrol car. *Id.* The officer subjected Pals to a pat-down search before detaining Pals in the patrol car, where Pals sat in the front passenger seat while the officer informed Pals that he needed to update the address on his driver's license, warned him about the municipal infraction he had violated, and instructed him to call the sheriff's office with his insurance policy information to alleviate the need for a no-insurance ticket. *Id.* After Pals agreed to do so, the officer asked Pals, "Say you don't have anything, any

weapons or drugs or anything like that in your vehicle, do you? Do you care if I take a look?" *Id.* Pals responded, "[S]ure, go ahead." *Id.* (alteration in original). The search of the vehicle revealed marijuana, which led to Pals's conviction for possession of a controlled substance after the district court denied his motion to suppress the evidence. *Id.* at 770–71.

On appeal, a majority of our court concluded that Pals did not voluntarily consent to the search of his vehicle under article I, section 8 of the Iowa Constitution. The majority considered four factors, including the "projected authority" the officer exerted over Pals during the pat-down search and the "inherently coercive" setting of Pals's detainment in the police vehicle on the side of a public highway. *Id.* at 782–83. Additionally, it observed that the officer had not advised Pals that the officer had "concluded business related to the stop at the time he asked for consent," which would have made the stop "a less coercive voluntary encounter," and the "lack of closure of the original purpose of this stop makes the request for consent more threatening." *Id.* at 783. Finally, the majority asserted,

> The lack of any statement that Pals was free to leave or that he could decline to give his consent to the search in this case is, at a minimum, a strong factor cutting against the voluntariness of the search, particularly in the context of a traffic stop where the individual is seized in the front seat of a police car. A warning of rights would serve to significantly neutralize the coercive setting in this case.

*Id.* (citation omitted).

In doing so, it proclaimed to apply an "Iowa version" of the *Schneckloth* totality-of-the-circumstances test, which it explained was similar to the Ohio

Supreme Court's ruling in *State v. Robinette*, 685 N.E.2d 762 (Ohio 1997). *Pals*,

805 N.W.2d at 782–83. In *Robinette*, the Ohio Supreme Court held,

> Once an individual has been unlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave.

685 N.E.2d at 771.

It is important to note that the State seeks to differentiate this case from

*Pals* on factual grounds, but it stops short of asking us to overrule *Pals*. We do

need to clarify what exactly the "Iowa version" of the *Schneckloth* test requires

because *Pals* offers little insight into how this "Iowa version" differs to provide

more protection than *Schneckloth* and how courts should apply it to analyze

consent searches. *See Est. of McFarlin v. State*, 881 N.W.2d 51, 59 (Iowa 2016)

("We do not ordinarily overrule our precedent sua sponte."). In a later case, one

member of the *Pals* majority described the "Iowa version" as "insist[ing] on a

more realistic analysis of what amounts to 'voluntary consent.' " *Baldon*,

829 N.W.2d at 823. This appears to derive from the language in *Robinette* that

"the totality of the circumstances must *clearly demonstrate* that a reasonable

person would believe that he or she had the freedom to refuse to answer further

questions and could in fact leave," 685 N.E.2d at 771 (emphasis added), perhaps

giving the *Pals* majority the impression that the Ohio Supreme Court applied a

more heightened totality-of-the-circumstances analysis than the Supreme Court

in *Schneckloth*. But the Ohio Supreme Court cited *Schneckloth* for that principle

and made clear in *Robinette* that the Ohio Constitution's search and seizure

provision "affords protections that are coextensive with those provided by the Fourth Amendment" and "the totality-of-the circumstances test is controlling in an unlawful detention to determine whether permission to search a vehicle is voluntary." *Id.*

Additionally, *Schneckloth* itself requires courts to "carefully scrutinize[]" the conditions that led to the consent in determining whether the consent was voluntary. 412 U.S. at 248. It is arbitrary and of no help to lower courts for us to simply say the "Iowa version" of the *Schneckloth* test requires courts to even more carefully scrutinize the circumstances than a federal court would scrutinize the same situation, especially when analyzing the totality of the circumstances is inherently subjective and limited to the unique facts of each case. All things considered, any difference between the "realistic analysis" set forth in *Pals* under the Iowa Constitution and the "careful[] scrutin[y]" required in *Schneckloth* under the Fourth Amendment boils down to semantics.

Regardless of how the totality-of-the-circumstances test is described, each case requires a conscientious examination of the conditions in which the consent was given with no one condition being dispositive. Going forward, courts should continue to apply our decades of precedent analyzing consent searches under the totality-of-the-circumstances test established in *Schneckloth*, which we have held involves considering an unlimited universe of factors, including

> *personal characteristics* of the [consenter], such as age, education, intelligence, sobriety, and experience with the law; and features of the context in which the consent was given, such as the length of detention or questioning, the substance of any discussion between the [consenter] and police preceding the consent, whether the

> [consenter] was free to leave or was subject to restraint, and whether the [consenter's] contemporaneous reaction to the search was consistent with consent.

*Lane*, 726 N.W.2d at 378 (quoting *Va Lerie*, 424 F.3d at 709) (alterations in original).

Relying on *Pals*, Hauge points to the following four factors in claiming his consent was not voluntary: (1) the projected authority Deputy Petersen displayed over Hauge in ordering him out of the vehicle, (2) the setting of the traffic stop on a public road, (3) that Deputy Petersen never informed Hauge that he was free to leave or could refuse to consent to the search, and (4) the lack of closure of the original purpose of the stop. Hauge is correct that we relied on these four factors in determining consent was not voluntary in *Pals*, but he errs in treating these four factors as dispositive and overlooks factual differences in his case from *Pals*.

The consent at issue in *Pals* to search the vehicle occurred after Pals had already consented to and endured a pat-down search, obeyed commands to empty his pockets, been detained in a police vehicle away from his vehicle parked on the side of the highway, and already received a verbal warning from the officer for the civil infraction responsible for the traffic stop. *Id.* at 770, 782–83. In contrast, Deputy Petersen displayed limited authority over Hauge prior to asking him if he had any weapons on him and whether he could check Hauge for weapons. He merely asked Hauge for identification and to exit the vehicle. Hauge seemingly was not intimidated by this projected authority because he responded assertively and questioned whether he was being detained. Notably, Deputy

Petersen informed Hauge that he was being detained after Hauge did not immediately exit the vehicle, but this alone is not dispositive because the words "detention" and "seizure" are interchangeable. *See, e.g., Warren*, 955 N.W.2d at 859; *Lowe*, 812 N.W.2d at 571 (majority opinion) ("After reviewing the totality of the circumstances, we determine that Audsley was not 'seized' or detained in violation of the Fourth Amendment."); *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002) ("Such a stop [for investigatory purposes] and a subsequent detention—even though temporary and for a limited purpose—is a 'seizure' within the meaning of the Fourth Amendment."); *State v. Gully*, 346 N.W.2d 514, 516 (Iowa 1984) (en banc) (equating seizures to "brief, on-the-spot detentions").

As we noted in *State v. Warren*, a " '[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of' the Fourth Amendment." 955 N.W.2d at 859 (alteration in original) (quoting *Whren*, 517 U.S. at 809–10. By this logic, Deputy Petersen was not being misleading when he told Hauge that he was being detained because Hauge was briefly being seized as part of a lawful traffic stop for a brief period to investigate a traffic violation. This intrusion was justified to facilitate the lawful arrest of the back-seat passenger. *Becker*, 458 N.W.2d at 607.

In any event, Deputy Petersen only informed Hauge that he was being detained as far as Hauge was required to exit the vehicle. It was after Hauge exited the vehicle that Deputy Petersen asked Hauge if he had any weapons on him and whether he could check Hauge for any weapons. Ultimately, "[t]here is

no evidence of threats or physical intimidation," and "[t]he record does not disclose that the officers made any misrepresentations" to Hauge about their authority to search Hauge without his consent or attempted to create the false impression that there would be no adverse consequences resulting from the search. *Lowe*, 812 N.W.2d at 574; *see also Reinier*, 628 N.W.2d at 469 ("These comments [the officers made about not looking for small drug quantities] bear upon the voluntariness of the consent because they are limitations on the nature of the crime under investigation and the objects sought by the search. The comments also tend to minimize the seriousness of possessing drugs for personal use or casual sales, and subtly create a false belief that no adverse consequences will result from a search if there is no meth lab in the house and the occupants are not major dealers." (citation omitted)).

Unlike the individual in *Pals*, Hauge was allowed to stand next to the vehicle instead of being detained in Deputy Petersen's police vehicle when Deputy Petersen sought his consent and Hauge immediately answered "Yup" without any hesitation and set his soda down to help facilitate the search. *See Lane*, 726 N.W.2d at 378 (listing the consentor's contemporaneous reaction to the request to search as a factor to consider). Further, Deputy Petersen only had to ask Hauge once for consent, and he did it in a casual manner instead of commanding it. *See Lowe*, 812 N.W.2d at 574 (considering the number of times the officers asked for consent before the consent was granted). Although the traffic stop was not completed, the time between when Officer Scherle made the traffic stop and Deputy Petersen asked Hauge for consent to search was only a

matter of a few minutes. *See id.* (noting the duration of the questioning as a factor in determining the voluntariness of consent). Nothing in the record suggests Hauge was not of sound mind or too impaired to consent, and his questions to Deputy Petersen suggest he was aware of his rights even though Deputy Petersen did not inform him that he could decline the pat-down.

Cumulatively, Hauge's behavior was consistent with consent, and the interaction between Hauge and Deputy Petersen was fairly benign leading up to the request to search. Therefore, we affirm the district court's denial of Hauge's motion to suppress the evidence obtained from the consensual search and Hauge's subsequent conviction.

**IV. Conclusion.**

We affirm the district court's denial of Hauge's motion to suppress and Hauge's conviction for the aforementioned reasons.

**AFFIRMED.**

Waterman, Mansfield, McDonald, Oxley, and McDermott, JJ., join this opinion. Appel, J., files a dissenting opinion.

**APPEL, Justice (dissenting).**

I respectfully dissent. This case on the surface is a run-of-the-mill traffic stop in rural Iowa. But run-of-the-mill cases can have profound implications for the larger system of law. As will be seen below, that is the case here.

This warrantless search case arising out of a routine traffic stop is a companion case to *State v. Williams*.[3] The search and seizure concepts described in the *Williams* introduction are fully applicable here. Namely, that the search and seizure provisions of our constitutions are designed to restrain government power, that broad discretionary government power to search and seize is anathema to constitutional principles, that our search and seizure provisions assign to the judicial branch—and not police officers—the power to draw the lines in the context of the search and seizure power of government, and that any exceptions to the discretional limiting and constitutionally required warrant requirement based on probable cause should be narrowly drawn to not engulf any of the above principles.

This case also involves a "consent" search. A few introductory comments will set the stage for a more detailed review of this important issue.

First, "consent" searches are now pervasive. Although there is no precise data, one source from the police estimated that up to ninety percent of searches

---

[3]*State v. Williams*, ___ N.W.2d ___ (Iowa 2022).

are now based on consent.[4] If so, all the other efforts to limit and control government power to search and seize become largely meaningless.[5] The bottom line here is that the scope and interpretation of search and seizure principles in the context of consent searches is critically important if the historic protections to liberty and indiscriminate treatment are to have any meaning in the daily life of our nation.

Second, other areas of law may inform how to structure any concept of consent in the context of search and seizure. For example, the United States Supreme Court's approach to the consent search under the Fourth Amendment in *Schneckloth v. Bustamonte* can only be fully understood when compared to its approach to the coerced confessions under the Fifth Amendment in *Miranda*. The scope of application of the Fourth Amendment's search and seizure principles is influenced by the equality principles welded onto our Constitution in the Fourteenth Amendment. Finally, what does the approach to waiver in the Sixth Amendment context offer in the analysis? We ought not to put on narrow blinders that prevent us from viewing the consent question from a broader perspective.

Third, the warrant requirement based on probable cause by a neutral magistrate is the heart of search and seizure law. Contrary to suggestions in

---

[4]Richard Van Duizend, L. Paul Sutton, & Charlotte A. Carter, *The Search Warrant Process* 19 (1984) (available at https://ncsc.contentdm.oclc.org/digital/api/collection/criminal/id/3/download [https://perma.cc/F4YF-U4RV]).

[5]George C. Thomas III, *Time Travel, Hovercrafts, and the Framers: James Madison Sees the Future and Rewrites the Fourth Amendment*, 80 Notre Dame L. Rev. 1451, 1505 (2005).

recent caselaw,[6] "reasonability" in the modern, pragmatic sense is not the touchstone of the Fourth Amendment or article I, section 8 of the Iowa Constitution. It just ain't so. As Professor Thomas Y. Davies has shown,[7] the term "reasonability" used by contemporary authorities means "contrary to reason" or "unlawful."[8] Reasonability was not the accordion concept to be employed as a flexible tool to dismantle the immutable, constitutionally based search and seizure protections to advance criminal law enforcement's policy goal. For years, we repeatedly recognized that the heart of search and seizure law was the warrant requirement based on probable cause. I adhere to the view that what has been called the "warrant preference approach" to search and seizure law is the best approach.

Fourth, I do not agree with the United States Supreme Court's characterization of consent as an "exception" to the warrant and probable cause requirement if police act reasonably.[9] This framework is incorrect. In my view, the situation is far simpler and more consistent with other areas of law. When a person knowingly and intelligently declines to assert search and seizure rights, a waiver occurs. There is no search where the property owner provides the government with permission to look around. The terms of the Fourth

---

[6]*Illinois v. Rodriguez*, 497 U.S. 177, 183–86 (1990).

[7]Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 736 (1999).

[8]*Id.* at 742.

[9]*Illinois v. Rodriguez*, 497 U.S. at 186.

Amendment or article I, section 8 of the Iowa Constitution related to search and seizure are not implicated when the holder of the right waives that right.

Fifth, it is wrongheaded and certainly ahistorical to evaluate the propriety of search and seizure law through the lens of its impact on the admission of evidence in a criminal trial. The purpose of search and seizure law is not to provide for fair trials or even to structure the process of criminal trials. Instead, the purpose is to limit arbitrary government power to search and seize. The exclusionary rule is simply a remedy that flows from a violation of search and seizure law through the arbitrary exercise of government power. So, in evaluating an approach to search and seizure, the fundamental question is whether the approach serves to eliminate broad discretion in the hands of government officials and avoids discriminatory application of government power. If the approach to search and seizure law encourages, or does not contain, the potential of arbitrary exercise of government power, it is time to reevaluate the approach.

Sixth, search and seizure is the *last* area of the law where we should reflexively follow the path of the United States Supreme Court. The United States Supreme Court has handed down a series of cases—*Whren v. United States*,[10] *Terry v. Ohio*,[11] *Atwater v. City of Lago Vista*,[12] to name just a few—that dramatically undercut constitutional protections in the name of pragmatic needs

---

[10] *Whren v. United States*, 517 U.S. 806 (1996).

[11] *Terry v. Ohio*, 392 U.S. 1 (1968).

[12] *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001).

of law enforcement. These cases, and many others, simply are not the persuasive authority for us to follow under the Iowa Constitution. Although in the past we engaged in what amounted to lockstep, or near lockstep, with the federal precedent in the search and seizure area, we abandoned that historical and discredited approach in *State v. Ochoa.*[13] Of course, it never made sense from a logical or historical point of view to abandon our federalist system, a system specifically designed to promote diversity in order to promote uniformity of Iowa law with the highly diluted individual rights approaches of the United States Supreme Court. We have given the lockstep interpretations of Iowa constitutional law, particularly in the area of search and seizure, a respectful burial.[14] That grave should be left unmolested. The court has the power to dig it up, but we should recognize the unquestionably independent nature of the Iowa state constitution, our general obligation as judges to uphold its independent provisions, and our specific historic precedents that demand that we approach the search and seizure provisions in the Iowa Constitution with a broad and liberal spirit.

Finally, I do not approach constitutional provisions related to search and seizure with a wistful sense of regret. The search and seizure provisions of our constitutions should not be regarded as unfortunate historical oddities to be neutered and cauterized by courts to advance contemporary majoritarian public policy goals of prohibition, drug enforcement, or criminal law generally. I regard

---

[13]*State v. Ochoa*, 792 N.W.2d 260, 264–67 (Iowa 2010).

[14]*See id.*

search and seizure limitations as a fundamental bulwark protecting individual liberty that is at the very heart of our constitutional scheme. I subscribe to the memorable words of Justice Jackson, written after he served as Chief Prosecutor at Nuremberg:

> These . . . are not mere second-class rights but belong in the catalogue of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. And one need only briefly to have dwelt and worked among a people possessed of many admirable qualities but deprived of these rights to know that the human personality deteriorates and dignity and self-reliance disappear where homes, persons and possessions are subject at any hour to unheralded search and seizure by the police.[15]

Even before the collapse of legal order in central Europe in the twentieth century, we recognized that the search and seizure provisions of the Iowa Constitution should be interpreted in "a broad and liberal spirit" to protect citizens.[16] In candor, the majority does not attempt to claim that it interprets our search and seizure provisions in a "broad and liberal spirit." I object not to the majority's application of its "broad and liberal spirit" but to its abandonment.

**I. Introduction.**

**A. Facts.** On June 14, 2019, at about 10:30 p.m., Officer Scherle was traveling on Highway 75 in Merrill, Iowa, when he passed a vehicle. At a suppression hearing in the case, Officer Scherle testified that all occupants of the vehicle were staring at him as they passed, with the back, female passenger

---

[15]*Brinegar v. United States*, 338 U.S. 160, 180–81 (1949) (Jackson, J., dissenting).

[16]*State v. Height*, 91 N.W. 935, 937 (Iowa 1902).

continuing to look at him. Officer Scherle followed the vehicle on the highway and noticed the vehicle overtaking another vehicle. Officer Scherle clocked the vehicle speeding and initiated a traffic stop. Another officer, Deputy Peterson, arrived at the scene to assist.

Deputy Peterson noticed Brent Hauge, the front-seat passenger in the vehicle. Peterson testified that Hauge was looking at the floor and did not attempt to make eye contact with him. Peterson stated that he saw Hauge grab a lottery ticket from the door compartment and stare at it, assisted by the light Deputy Peterson was shining in his direction.

Officer Scherle learned from a background check that the backseat female passenger had a mittimus warrant for her arrest for failure to serve a sentence arising out of a charge of domestic abuse with a deadly weapon. At that point, officers decided to ask all persons to exit the vehicle. Deputy Peterson testified that Hauge was asked to leave the front seat because he was "reaching multiple times out of my line of sight, the deflection, [and] not wanting to make eye contact." Deputy Peterson, however, did not notice any objects on Hauge's person.

Once outside the vehicle, Deputy Peterson asked Hauge if he had any guns. Hauge stated he did not. Deputy Peterson told Hauge, however, that while he was not under arrest, he was detained. He then patted Hauge down and, while doing so, felt an object in the front right pocket. Deputy Peterson testified that he recognized the object as a pipe and a small plastic bag of a crystal-like

substance believed to be methamphetamine. Hauge was charged with possession of methamphetamine, second offense.

Hauge filed a motion to suppress the evidence uncovered by Deputy Peterson in his pat-down search. After a hearing, the district court concluded that Deputy Peterson did not have reason to believe that Hauge had a weapon and therefore was not allowed to complete a pat-down. However, the district court concluded that Hauge consented to the search and, as a result, a reasonable basis for the pat-down was not required. The district court further concluded that the scope of the pat-down was not exceeded when Deputy Peterson searched Hauge's pocket based on the "plain feel" exception to the warrant requirement. Finally, the district court concluded that because Hauge was not provided with *Miranda* rights after being detained, any statements made by him pertaining to the identification of the object found in his pocket would not be admissible. After a bench trial, Hauge was found guilty. He appealed.

**B. Issues on Appeal.** Hauge raises several issues on appeal. First, he maintains that the officers had no authority to order him out of the vehicle. Although he recognizes that the United States Supreme Court has embraced the view that passengers may automatically be asked to exit a stopped vehicle in *Maryland v. Wilson*[17] and *Pennsylvania v. Mimms*,[18] he notes that prior to these federal cases, we required in *State v. Becker*[19] that the state show that law

---

[17]*Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997).

[18]*Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (per curiam).

[19]*State v. Becker*, 458 N.W.2d 604, 607–08 (Iowa 1990), *abrogated on other grounds by Knowles v. Iowa*, 525 U.S. 113 (1998).

enforcement has reasonable suspicion that a passenger has committed a crime before being ordered to exit a vehicle. Hauge urges us not to follow the federal precedent but instead to adhere to our original approach in *Becker*.

Second, Hauge challenges the district court's finding that he voluntarily consented to search. He cites extensively this court's discussion of the consent issue in *State v. Pals*.[20] In *Pals*, we noted that other states, under their state constitutions, have required a *Miranda*-type statement that persons have a right to refuse consent.[21] He further notes that even if such a statement is not required, we should nonetheless apply the "knowing and voluntary" test utilized by the United States Supreme Court in *Johnson v. Zerbst*.[22] Finally, even if we do not adopt a *Johnson* waiver standard, Hauge urges that we apply the totality-of-the-circumstances test of *Schneckloth v. Bustamonte*[23] "with teeth," just as we did in *Pals*.

The State resists. The State urges us to accept the federal authority of *Wilson*[24] and *Mimms*[25] with respect to the power of officers to order passengers to exit the vehicle. In the alternative, the State claims that even under the more stringent test in *Becker*,[26] the State had a sufficient cause to order Hauge to exit because the person with the outstanding warrant was seated in the backseat of

---

[20]*State v. Pals*, 805 N.W.2d 767, 777–84 (Iowa 2011).

[21]*Id.* at 779.

[22]*Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

[23]*Schneckloth v. Bustamonte*, 412 U.S. 218, 233 (1973).

[24]*Wilson*, 519 U.S. at 413–15.

[25]*Mimms*, 434 U.S. at 111.

[26]*Becker*, 458 N.W.2d at 607–08.

a two-door vehicle and it would have been less safe to have her exit on the driver's side adjacent to the roadway. On the issue of the pat-down search, the State asserts that Hauge voluntarily consented to the search. Finally, in any event, the State asserts, contrary to the findings of the district court, that there was sufficient reasonable suspicion that Hauge was armed and dangerous.

The majority declines to address the larger issue of per se authority to order passengers to exit a stopped vehicle under *Wilson* and *Mimms*. Instead, the majority concludes the exit of Hauge was necessary in order to facilitate the release of the backseat passenger. Once lawfully removing Hague from the vehicle, the remaining dispositive issue for the majority is whether Hauge lawfully consented to the pat-down search that resulted in the discovery of the pipe and plastic bag with meth-like crystals.

For the following reasons, I dissent from the majority's view that Hauge in this case voluntarily consented to the search. As a result, I would vacate his conviction and remand the matter to the district court.

**II. Overview of Consent Searches.**

**A. Concept of Consent, Voluntariness, and Coercion in the Law.** The meanings of the closely related and overlapping concepts of consent, waiver, voluntariness, and coercion have arisen in a number of legal contexts. For instance, there is the concept of "informed consent" with respect to medical procedures.[27] As a general proposition, in order to obtain valid consent for

---

[27] *See, e.g.*, *Andersen v. Khanna*, 913 N.W.2d 526, 537 (Iowa 2018).

invasive medical procedures, the patient must give what has been called "informed consent."[28] "Informed consent" means that the patient is advised of the nature of the procedure, the probable benefits, the risks and hazards, and the anticipated benefits.[29] Informed consent promotes personal autonomy and personal choice.[30] For purposes of informed consent for a medical procedure, there is no such thing as consent by ignorant people.

The effectiveness of consent has been explored in the context of power imbalances in a number of settings.[31] For example, under the law of contracts, the doctrine of contracts of adhesion invalidates provisions apparently agreed to when the power imbalance is overwhelming.[32] A contract of adhesion is "[a] standard-form contract prepared by one party, to be signed by another party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms."[33] The terms of a contract of adhesion may not be enforced where "there is a disturbing showing of unfairness, undue oppression, or unconscionability."[34]

---

[28]*Id.*

[29]Christo Lassiter, *Consent to Search by Ignorant People*, 39 Tex. Tech. L. Rev. 1171, 1192 (2007) [hereinafter Lassiter].

[30]*Washington v. Glucksberg*, 521 U.S. 702, 724–25 (1997).

[31]Lassiter, 39 Tex. Tech. L. Rev. at 1189–91 (discussing power imbalance as a basis to vitiate consent).

[32]*Zigrang v. U.S. Bancorp Piper Jaffray, Inc.*, 123 P.3d 237, 240 (Mont. 2005).

[33]*Adhesion Contract, Black's Law Dictionary* 403 (11th ed. 2019).

[34]Vladimir R. Rossman & Morton Moskin, eds., *Commercial Contracts: Strategies for Drafting and Negotiating* § 8.06[A] (2d ed. 2021 & 2022-1 Supp.) (quoting *Klos v. Lotnicze*, 133 F.3d 164, 169 (2d Cir. 1997)).

The question of power imbalances on consent has been explored in other areas of law. With respect to sexual conduct, there has been some recent evolution of law to explicitly recognize the role of power imbalances on the question of consent.[35] Feminists argue that power imbalance can explain why a woman does not say "no" or does not physically resist an unwanted sexual encounter.[36] The goal of rape law, according to the theory, is to promote autonomy and self-determination.[37] Because of the power imbalance, according to the theory, what is important for rape law's purposes is "nonconsent," not "noncoercion" in the physical sense.[38]

The above examples show that "consent" can involve the consideration of relationships as well as specific verbal content. Consent is a fairly demanding concept; it implies that the person alleged to be consenting has a real choice in the matter at hand. The concept of consent is tied to the goal of preserving a "true choice"[39] and the personal autonomy of the individual.

The term "voluntary" sometimes appears in conjunction with, or separately from, the term consent. The term "voluntary" is also not necessarily precise. It is

---

[35]Lassiter, 39 Tex. Tech. L. Rev. at 1190 n.141 ("Feminist scholars argue that women are unable to freely consent to heterosexual relations because women have been raised from childhood to accept the dominant power of men and to be sexually submissive.").

[36]Josephine Ross, *Blaming the Victim: 'Consent' Within the Fourth Amendment and Rape Law*, 26 Harv. J. Racial & Ethnic Just. 1, 43–61 (2010).

[37]*Id.* at 12.

[38]*Id.* at 12–13.

[39]*Emps. of Dep't of Pub. Health & Welfare v. Dep't of Pub. Health & Welfare*, 411 U.S. 279, 296 (1973) (Marshall, J., concurring in the result) (noting that the state could not have a true choice at all if it had to choose between consenting to federal suits or stopping some important public services; this lack of true choice meant the state did not consent).

sometimes narrowly claimed that an act is voluntary if there is a lack of coercion.[40] But what amounts to coercion? Further, coercion is sometimes said to be determined by a totality-of-circumstances-type test. Whether an act is "voluntary" or "involuntary" because of some coercive pressure is not something that can be decided by any formula. Judges who generally agree on the facts in a voluntariness context may sharply disagree on their significance in determining voluntariness.[41]

Finally, there is the term "waiver," a species, if you will, of consent. The United States Supreme Court considered a case where the defendants did not have the assistance of counsel during the trial in *Johnson v. Zerbst*.[42] The defendant had been convicted of possessing and uttering counterfeit money and did not have a lawyer at trial.[43] On collateral attack, the federal district court ruled that the lack of counsel at trial was a matter that could be raised only on appeal, not in a collateral proceeding.[44] The United States Court of Appeals for the Fifth Circuit affirmed.[45]

---

[40]*Schneckloth*, 412 U.S. at 227.

[41]*See State v. Baldon*, 829 N.W.2d 785, 803 (Iowa 2013) (resulting in a 4–3 divide on issue of voluntariness of consent to search in parole agreement which must be executed to obtain release); *State v. Iowa Dist. Ct.*, 801 N.W.2d 513, 528–29 (Iowa 2011) (resulting in a 4–3 split on whether requirement that defendant attend sex offender treatment program, where admitting past behavior is a part of the program, in order to earn good time credits violates privilege against self-incrimination).

[42]*Johnson*, 304 U.S. 458.

[43]*Id.* at 459.

[44]*Id.*

[45]*Id.*

In a short opinion by Justice Black, the Supreme Court first resolved the jurisdictional question by concluding that if the defendant was deprived of counsel at trial, the proceeding was void and the courts without jurisdiction.[46] Thus, the lack of counsel at the underlying trial could be addressed on collateral attack.[47] Justice Black then proceeded to address the question of whether the defendant waived his right to counsel. Justice Black noted that "courts indulge every reasonable presumption against wavier" of fundamental constitutional rights and that courts "do not presume acquiescence in the loss of fundamental rights."[48] According to Justice Black:

> A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.[49]

As plainly seen above, "waiver" includes a requirement that it be knowledgeable—meaning that a person must know of the available options and their consequences—and it must be intelligent, which certainly means something like reasonable under the circumstances. It has both subjective (knowledge) and objective (reasonable under the circumstances) components.

---

[46]*Id.* at 463 ("The Sixth Amendment withholds from federal courts, in all criminal proceedings, the power and authority to deprive an accused of his life or liberty unless he has or waives the assistance of counsel." (footnote omitted)).

[47]*Id.* at 464.

[48]*Id.* (first quoting *Aetna Ins. v. Kennedy to Use of Bogash*, 301 U.S. 389, 393 (1937), second quoting *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 307 (1937)).

[49]*Id.*

The terms "consent," "voluntary," "coercion," and "waiver" are all obviously related and overlapped. In court opinions, they may be used with a lack of precision. Even within one judicial opinion, the terms may be used inconsistently. Further, the totality-of-circumstances-type test applying those terms is often itself vague and lacking in predictability.

**B. "Consent," Interrogation, and the Rise of *Miranda v. Arizona.***

1. *Pre*-Miranda *approach.* In the years prior to *Miranda v. Arizona,*[50] the state and federal courts reviewed the voluntariness of confessions in many cases. As a general matter, the courts utilized a loosely described "totality of the circumstances" voluntariness test that considered all of the facts and the circumstances of the case.[51] It was not unusual that in many cases (including those involving the death penalty) that state courts upheld even questionable interrogation methods.[52]

The dean of search and seizure law, Professor Yale Kamisar, has pointed to *Davis v. North Carolina*[53] as an example of how the "totality of the circumstances" approach worked, or did not work.[54] In *Davis,* the defendant was held incommunicado by police for sixteen days.[55] Davis was advised of his right

---

[50]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[51]Yale Kamisar, *On the Fortieth Anniversary of the* Miranda *Case: Why We Needed It, How We Got It—And What Happened to It,* 5 Ohio St. J. Crim. L. 163, 163 (2007) [hereinafter Kamisar].

[52]*Id.* at 167–68 (pointing out that lower courts are often prone to accepting police's claims and easily rejecting defendants' versions of the story; noting also that in many death penalty cases that eventually made it to the Supreme Court, state courts upheld even the most outrageous interrogation methods).

[53]*Davis v. North Carolina*, 384 U.S. 737 (1966).

[54]Kamisar, 5 Ohio St. J. Crim. L. at 166–68.

[55]*Davis*, 384 U.S. at 739.

not to make a statement only on the sixteenth day, and only after he had already confessed orally before he was to sign his written statement.[56] He was later convicted and sentenced to death.[57] The interrogation, however, was upheld as voluntary by the state and federal courts in North Carolina.[58] In short, under the "totality of the circumstances," the state's utter determination to uphold the conviction could overshadow objective facts that point in the direction of the lack of voluntariness.

The Supreme Court reviewed the case and ultimately reversed the conviction.[59] Professor Kamisar questioned how many coerced confessions were found voluntary in the lower courts and yet were not reversed because of the narrow channels provided by the often discretionary appellate review process.[60] Certainly, a case-by-case review of many confession cases by the United States Supreme Court was simply not possible while lower courts, even in death penalty cases like *Davis*, were inclined to uphold even very coercive police practices.[61] Professor Kamisar graced the pages of the Iowa Law Review with commentary that explored the unmanageability problem.[62]

---

[56]*Id.* at 739–40.

[57]*Id.* at 738.

[58]*Id.* at 738–39.

[59]*Id.* at 752–53.

[60]Kamisar, 5 Ohio St. J. Crim. L. at 168 (noting that in the thirty years pre-*Miranda*, among all the state confession cases, "[o]nly one condemned person out of four had his case reviewed by the highest court in the land and only one out of eight obtained a reversal").

[61]*Id.* at 168–69.

[62]Yale Kamisar, Gates*, 'Probable Cause,' 'Good Faith,' and Beyond*, 69 Iowa L. Rev. 551, 570–71 (1984).

In addition to the impracticability of case-by-case review of confession cases, the spongy nature of the test of voluntariness complicated appellate review. The pre-*Miranda* voluntariness cases came to different conclusions on facts that seem hardly distinguishable.[63] As noted by Professor Geoffrey Stone, the inability "to articulate a clear and predictable definition of 'voluntariness,' the apparent persistence of state courts in utilizing the ambiguity of the concept to validate confessions of doubtful constitutionality, and the resultant burden on its own workload" were factors that led the Supreme Court to seek to develop a more manageable test.[64]

2. *Bright-line* Miranda v. Arizona *rule to regulate interrogations.* The rest, as they say, is history. The Supreme Court decided *Miranda.* The Court required that when a suspect was in custody, the now well-known *Miranda* warning must be given. The Court resolved the problem of its inability to review a plethora of cases and the ambiguity of its prior cases with a rule of disclosure. The inability of the Supreme Court to review the many cases, particularly in southern states, where coerced confessions were upheld under plastic application of the "totality of the circumstances" test, was resolved in favor of a "bright line" rule.

---

[63]Professor Brian R. Gallini invites us to compare as virtually indistinguishable *Spano v. New York*, 360 U.S. 315, 323–24 (1959) (concluding that a confessing defendant's will was overborne by police tactics that included exploitation of defendant's poor education and emotional nature, relied on multiple lengthy interrogations, denied counsel, and relied on trickery from a false friend), with *Lisenba v. California*, 314 U.S. 219, 292 (1941) (concluding that an uneducated defendant's confession was voluntary notwithstanding police interrogation, physical contact, sleep deprivation, prolonged interrogation, and denial of counsel). *See* Brian R. Gallini, Schneckloth v. Bustamonte*: History's Unspoken Fourth Amendment Anomaly*, 79 Tenn. L. Rev. 233, 243 n.75 (2012) [hereinafter Gallini].

[64]Geoffrey R. Stone, *The* Miranda *Doctrine in the Burger Court*, 1977 Sup. Ct. Rev. 99, 102–03 (1977).

Much has been written about *Miranda*, and I make only a few salient points here. Quoting *Weems v. United States*, Chief Justice Warren emphasized that with respect to individual rights, "[t]he meaning and vitality of the Constitution have developed against narrow and restrictive construction."[65] The Chief Justice noted that those who framed the Constitution and the Bill of Rights "were ever aware of subtle encroachments on individual liberty"[66] and "knew that 'illegitimate and unconstitutional practices get their first footing . . . by silent approaches and slight deviations from legal modes of procedure.' "[67] The privilege against incrimination "has consistently been accorded a liberal construction."[68]

Chief Justice Warren reviewed the history of brutal confessions revealed by the Wickersham Report[69] but noted that the modern practice of in-custody interrogation involves psychological rather than physical coercion.[70] Yet, the right against self-incrimination was part of a larger principle, namely, the individual's substantive right "to a private enclave where he may lead a private life."[71]

---

[65]*Miranda*, 384 U.S. at 443–44 (quoting *Weems v. United States*, 217 U.S. 349, 373 (1910)).

[66]*Id.* at 459.

[67]*Id.* (omission in original) (quoting *Boyd v. United States*, 116 U.S. 616, 635 (1886), *overruled in part on other grounds by Warden v. Hayden*, 387 U.S. 294 (1967)).

[68]*Id.* at 461.

[69]*Id.* at 445.

[70]*Id.* at 448.

[71]*Id.* at 460 (quoting *United States v. Grunewald*, 233 F.2d 556, 581–82 (2d Cir. 1956) (Frank, J., dissenting), *rev'd*, 353 U.S. 391 (1957)).

In considering whether the privilege against self-incrimination had been violated in cases before the Court, Chief Justice Warren repeatedly used the concept of waiver. The Chief Justice favorably cited *Johnson v. Zerbst*, noting that the Court had "always set high standards of proof for the waiver of constitutional rights."[72] Reasoning from *Johnson*, the Chief Justice observed that "a valid waiver will not be presumed simply from the silence of the accused."[73] The Chief Justice noted that "there is no room for the contention that the privilege is waived if the individual answers some questions or gives some information" prior to invoking his right to remain silent.[74] Any evidence that the person was threatened, tricked, or cajoled into "waiver" would show that the defendant "did not voluntarily waive his privilege."[75] The Chief Justice stressed that "[t]he warnings required and the waiver necessary . . . are . . . prerequisites to the admissibility of any statement made by a defendant."[76]

In one passage, however, the Chief Justice used the language of voluntariness. According to the Chief Justice, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible."[77] It seems, however, that the ambiguous phraseology was not designed to depart

---

[72]*Id.* at 475.

[73]*Id.*

[74]*Id.* at 475–76.

[75]*Id.* at 476.

[76]*Id.*

[77]*Id.* at 478.

from the requirements of waiver under *Johnson* but merely to restate some of the elements required in the context of the case.

In order to address the central question of whether in-custody interrogations were unconstitutional, the Chief Justice developed a mandatory four-pronged warning requirement. The Chief Justice declared:

> [W]e will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given. Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact with authorities, can never be more than speculation; a warning is a clearcut fact.[78]

Clearly, the Warren Court was aware of the problems of the pre-*Miranda*, case-by-case method in trying to determine the constitutionality of in-custody interrogation and sought to add a sharper element to the mix. In addition, the Chief Justice noted that "a warning at the time of the interrogation is indispensable to overcome [the] pressures and to insure that the individual knows he is free to exercise the privilege at that point in time."[79] Again, the Chief Justice was sensitive to the psychological pressures that could be placed on a criminal defendant.

3. *Aftermath of* Miranda. At the time, it would be an understatement to say that the reaction to *Miranda* in law enforcement quarters was highly critical and way out of proportion. The proverbial sky has fallen many times when a court decision viewed by law enforcement as favorable to a criminal defendant appears.

---

[78]*Id.* at 468–69 (footnote omitted).

[79]*Id.* at 469.

*Miranda* was no exception. For example, the police chief of Los Angeles declared that "all confessions would soon be worthless."[80] Other police officials declared that they would be forced to fight criminals "with two hands tied behind their back."[81] These dire predictions were ideologically but not empirically based. After *Miranda*, a raft of studies were conducted, with the vast majority concluding that *Miranda*'s impact was marginal on the number of confessions police were able to obtain from the accused in custody.[82]

Nonetheless, after the urban unrest in 1967 and 1968, "law and order" was a politically attractive theme and helped President Nixon win the presidency.[83] After his election on a "law and order" platform, President Nixon proceeded to fill vacancies on the Supreme Court with persons unsympathetic to *Miranda*.[84] As a result, a process began in the Burger Court, and extended into the Rehnquist Court, that has whittled away the scope of *Miranda*.[85] Yet, in

---

[80]*See* Gallini, 79 Tenn. L. Rev. at 250–51, 251 n.136 (quoting Brian Palmer, *What Happens When Your* Miranda *Rights Are Revoked?*, Slate.com (May 10, 2010), http://www.slate.com/id/2253499/ [https://perma.cc/YM5D-9A2Q]).

[81]*Id.* at 250 & n.134 (quoting Stephen L. Wasby, *Continuity and Change: From the Warren Court to the Burger Court* 183 (1976)).

[82]*Id.* at 272–73; *see* Richard A. Leo, *Questioning the Relevance of* Miranda *in the Twenty-First Century*, 99 Mich. L. Rev. 1000, 1007–09 & nn.41–51 (2001); Stephen J. Schulhofer, Miranda*'s Practical Effect: Substantial Benefits and Vanishingly Small Social Costs*, 90 Nw. U. L. Rev. 500, 502 (1996) [hereinafter Schulhofer]; George C. Thomas III, *Plain Talk About the* Miranda *Empirical Debate: A "Steady State" Theory of Confessions*, 43 UCLA L. Rev. 933, 942–43 (1996).

[83]Gallini, 79 Tenn. L. Rev. at 252.

[84]*Id.* at 253.

[85]*See, e.g., Oregon v. Hass*, 420 U.S. 714, 723–24 (1975) (holding that statements made after *Miranda* warnings not honored may be used for impeachment); *Harris v. New York*, 401 U.S. 222, 226 (1971) (holding that statements obtained without *Miranda* warnings may be used for impeachment).

the end, the main thrust of *Miranda* was embraced as part of our constitutional culture in *Dickerson v. United States*.[86]

4. *Implications for law of search and seizure.* One might ask what relevance *Miranda*, based on constitutional protections against self-incrimination, has in the context of search and seizure law. The similarities, however, are clear. The totality-of-the-circumstances test of "consent" or "voluntariness" in the pre-*Miranda* era was, as pointed out by an experienced federal judge, "exactly the same test of the voluntariness of the consent, as determined from the totality of the circumstances, that supposedly proved impossible and unwieldy as a measure of the admissibility of confessions."[87] How, then, did an utterly unmanageable, completely inadequate test used for self-incrimination cases—a test that also produced unpredictable results and could not be adequately supervised with discretionary appeals—all of a sudden become acceptable for search and seizure cases? Are the constitutional rights protecting the security of citizens from arbitrary government search and seizure of lesser importance than a criminal defendant's interest in avoiding involuntary confessions? Can it be that the right of citizens to be secure in the persons, homes, papers, and effects shrivels away with the assertion of an important government interest? Isn't the need for search and seizure protections the highest when government claims are the strongest? And, if the predictions of the terrible pragmatic impact on the

---

[86]*Dickerson v. United States*, 530 U.S. 428, 438–40 (2000).

[87]Gerard E. Lynch, *Why Not a* Miranda *for Searches?*, 5 Ohio St. J. Crim. L. 233, 234 (2007) [hereinafter Lynch].

ability of the state to obtain confessions proved wrong, why would "the sky is falling" predictions be right under search and seizure law?

**C. Consent, Search and Seizure, and the Rise of *Schneckloth v. Bustamonte.***

1. *Development of law of consent to search to avoid liability.* For those interested in the relationship between common law and constitutional provisions related to search and seizure, there is much to learn. As has been pointed out by Fourth Amendment scholar George C. Thomas III,[88] one of the earliest purposes of warrants was to shield government officials from tort suits.[89] In an early state case, *Banks v. Commonwealth*,[90] the court recognized that a search "with the knowledge and permission of the one lawfully in possession" of a warrant would not be unlawful.[91] But what about a warrantless search? Would not a common law trespass action be available?

Perhaps these questions could be answered by an early Iowa case showing the role of consent in a warrantless-search case. In *McClurg v. Brenton*,[92] the mayor recruited a team of royal bloodhounds to search a home for stolen chickens without a warrant at ten or eleven o'clock at night.[93] This group of

---

[88]George C. Thomas III, *The Common Law Endures in the Fourth Amendment*, 27 Wm. & Mary Bill Rts. J. 85, 85–87 (2018) (discussing the common law protection of privacy, property, and liberty in colonial America and its influence on the drafting of the Fourth Amendment; arguing for the idea that Fourth Amendment issues should be decided by asking whether a ruling would reflect "the privacy/security balance favored by the founders").

[89]*Id.* at 90–93.

[90]*Banks v. Commonwealth*, 227 S.W. 455 (Ky. Ct. App. 1921).

[91]*Id.* at 457.

[92]*McClurg v. Brenton*, 98 N.W. 881 (Iowa 1904).

[93]*Id.* at 881.

people approached the home of McClurg.[94] The Mayor announced that he was the mayor.[95] That was a mistake. McClurg sued in trespass and sought compensatory and punitive damages.[96] The defendants claimed consent.[97] The trial court granted a directed verdict on the consent theory.[98]

The *McClurg* court emphasized that no amount of incriminating evidence justifies the search of a residence for stolen goods without a warrant[99] The *McClurg* court noted that under the circumstances, it was doubtful that any alleged consent would be truly voluntary.[100] The directed verdict on grounds of consent was reversed in light of evidence that showed the search was conducted under color of authority.[101] In *McClurg*, consent was not regarded as "an exception" to the warrant requirement, but rather a defense to a tort claim based on invasion of privacy.

2. *United States search and seizure cases prior to* Schneckloth v. Bustamonte. The United States Supreme Court first brushed by the issue of waiver or consent in a search and seizure context in *Amos v. United States*.[102] In *Amos*, federal officers arrived at the home of the defendant, informed the

---

[94]*Id.*

[95]*Id.* at 882.

[96]*Id.*

[97]*Id.* at 881.

[98]*Id.*

[99]*Id.* at 883.

[100]*Id.*

[101]*Id.*

[102]*Amos v. United States*, 255 U.S. 313 (1921).

defendant's wife that they were federal officers and that they had come to search the residence for violations of revenue law.[103] The wife provided access to the home and the curtilage.[104] The agents discovered illegal whisky.[105]

According to the *Amos* Court, a warrantless search of the home was unreasonable.[106] The *Amos* Court declared:

> The contention that the constitutional rights of defendant were waived when his wife admitted to his home the government officers, who came, without warrant, demanding admission to make search of it under government authority, cannot be entertained. . . . [I]t is perfectly clear that under the implied coercion here presented, no such waiver was intended or effected.[107]

Notably, the *Amos* Court utilized the term "waiver" throughout the opinion. The term "consent" is nowhere to be found. The *Amos* Court, foreshadowing developments in the social sciences, emphasized that "under the implied coercion . . . presented, no . . . waiver was intended."[108]

The Supreme Court considered the issue of consent in *Davis v. United States*.[109] In *Davis*, authorities suspected that the accused was unlawfully selling gasoline at above-market prices without requiring the necessary coupon that the law required.[110] Officials at the scene demanded that the accused produce

---

[103]*Id.* at 315.

[104]*Id.*

[105]*Id.*

[106]*Id.* at 315–17.

[107]*Id.* at 317.

[108]*Id.*

[109]*Davis v. United States*, 328 U.S. 582 (1946).

[110]*Id.* at 585.

gasoline coupons in his possession.[111] The accused eventually was talked into it.[112] In an opinion written by Justice Douglas, the Supreme Court stated that "[t]he strict test of consent" did not apply where the officials sought public inspection at a place of business where the documents were required to be kept.[113]

Justice Frankfurter, joined by Justices Murphy and Rutledge, filed a spirited dissent.[114] Justice Frankfurter noted that the majority determined that the consent was voluntary because of the nature of the object being sought.[115] According to Justice Frankfurter, this made no sense: "To make voluntariness turn on the nature of the quest instead of on the nature of the response of the person in control of the sought documents, is to distort familiar notions on the basis of which the law has heretofore adjudged legal consequences."[116] Further, Justice Frankfurter noted that the warrantless search exposed the legal system to what scholars would currently describe as hindsight bias:

> It cannot be that the Constitution meant to make it legally advantageous not to have a warrant, so that the police may roam freely and have the courts retrospectively hold that the search that was made was "reasonable," reasonableness being judged from the point of view of obtaining relevant evidence.[117]

---

[111]*Id.*

[112]*Id.* at 586.

[113]*Id.* at 593.

[114]*Id.* at 594 (Frankfurter, J., dissenting).

[115]*Id.* at 594–95.

[116]*Id.* at 600.

[117]*Id.* at 595; *see also* Tracey Maclin, *The Good and Bad News About Consent*, 39 McGeorge L. Rev. 27, 41 (2008) [hereinafter Maclin].

Iowa Law School dean Wiley Rutledge agreed in a separate opinion, observing, "[T]he search followed on consent given in the reasonable belief that it was necessary to avoid the breaking and entry. I think it was therefore in no better case legally than if in fact the breaking and forceable entry had occurred."[118]

In another pre-*Schneckloth* case, *Stoner v. California*, the Court seems to use the language of waiver.[119] The question in *Stoner* was whether a hotel clerk could authorize a warrantless search of Stoner's room.[120] According to the *Stoner* Court, "[i]t was a right . . . which only [Stoner] could waive by word or deed, either directly or through an agent."[121]

A few years later, the Supreme Court decided *Zap v. United States*.[122] In *Zap*, a contractor for the Navy objected to government seizure of a check that showed that he filled in an amount for expenses allegedly incurred by a test pilot.[123] In a contract with the Navy, the defendant specifically agreed to permit inspection of accounts and records related to the work.[124] The government demanded the production of the check pursuant to the terms of the contract.[125]

---

[118]*Davis*, 328 U.S. at 623 (Rutledge, J., dissenting).

[119]*Stoner v. California*, 376 U.S. 483, 489 (1964) (suggesting that giving consent to let the police in was not the right of the night clerk's and that such consent could only be waived by word or deed of the petitioner).

[120]*Id.* at 486–87.

[121]*Id.* at 489.

[122]*Zap v. United States*, 328 U.S. 624 (1946), *vacated*, 330 U.S. 800 (1947) (per curiam).

[123]*Id.* at 626.

[124]*Id.* at 626–27.

[125]*Id.* at 627.

In an opinion by Justice Douglas, the Supreme Court noted that Fourth Amendment rights "may be waived" and that "when petitioner, in order to obtain the government's business, specifically agreed to permit inspection of his accounts and records, he voluntarily waived such claim to privacy which he otherwise might have had as respects business documents related to those contracts."[126] Interestingly, unlike in *Davis*, Justice Douglas used the term "waiver" and not the language of "voluntariness."

As in *Davis*, Justice Frankfurter, along with Justices Murphy and Rutledge, dissented.[127] Justice Frankfurter argued that the search might have been valid but that the seizure of the check was not.[128] Because there was no warrant with items to be seized described with particularity, there was no judicially approved right to seize anything.[129]

In any event, the mandate in *Zap* was recalled and there is thus no reliable precedent arising from the case.[130] Yet, it is interesting to note that Justice Douglas wrote both *Davis* and *Zap* and that Justice Frankfurter objected to Justice Douglas's handling of "voluntariness" in *Davis* but not his "waiver" analysis in *Zap.*

The above cases demonstrate a couple of points. First, prior to *Schneckloth,* the precedents of the United States Supreme Court, with the

---

[126]*Id.* at 628.

[127]*Id.* at 630 (Frankfurter, J., dissenting).

[128]*Id.* at 632.

[129]*Id.* at 632–33.

[130]*See Zap*, 330 U.S. 800.

exception of *Davis,* utilized the language of "waiver" in the search and seizure context. Although Justice Douglas used the language of "voluntariness" in *Davis*, he shifted to "waiver" in *Zap.* Overall, prior precedent pointed generally in the direction of waiver when constitutional rights were involved, including the rights against arbitrary government searches and seizures. To the extent it did not, Justice Frankfurter and Dean Rutledge had the better argument.

**III. Justice Stewart, Backlash, and the Birth of *Schneckloth v. Bustamonte.***

**A. Introduction.** In 1971, the United States Supreme Court visited the issue of consent in a search and seizure case in *Schneckloth v. Bustamonte.*[131] Since *Miranda* was decided in 1966, two important historical developments occurred. First, the Warren Court was subjected to withering criticism because of *Miranda.*[132] The slogan "Impeach Earl Warren" emerged.[133] Second, the makeup of the United States Supreme Court changed through the politics of the appointment process. President Nixon attacked *Miranda* and stressed the need to appoint Supreme Court Justices with a different point of view.[134] He had that opportunity with the appointments of Warren Burger, Lewis Powell, and William Rehnquist. One of the questions in *Schneckloth* was whether President Nixon had accomplished his political goal of reshaping the United States Supreme Court.

[131]*Schneckloth*, 412 U.S. 218.

[132]*See* Gallini, 79 Tenn. L. Rev. at 251–53.

[133]*Id.* at 283 n.389.

[134]*Id.* at 252–53.

**B. Court of Appeals Opinion in *Schneckloth.*** *Schneckloth* involved a traffic stop where a headlight and a license plate light were burned out.[135] The driver could not produce a driver's license.[136] A passenger produced a driver's license and stated that the car belonged to his brother.[137] The driver and the five passengers were standing outside the automobile when additional police officers arrived at the scene.[138] When the officers asked if they could search the car, one of the passengers gave consent[139] and said "Sure, go ahead."[140] Police found evidence under the rear seat indicating that the car had been stolen.[141]

The Ninth Circuit Court of Appeals held that the consent was invalid.[142] According to the Ninth Circuit, the state had to show both an absence of coercion and that the subject knew consent could be refused.[143] The Ninth Circuit reasoned that consent could not be presumed from a verbal agreement because "a reasonable person might read an officer's 'May I' as the courteous expression of a demand backed by force of law."[144]

---

[135]*Bustamonte v. Schneckloth*, 448 F.2d 699, 699 (9th Cir. 1971), *rev'd*, 412 U.S. 218 (1973).

[136]*Id.*

[137]*Id.*

[138]*Id.* at 699–700.

[139]*Id.* at 700.

[140]*Schneckloth*, 412 U.S. at 220.

[141]*Bustamonte*, 448 F.2d at 700.

[142]*Id.* at 701.

[143]*Id.* at 700.

[144]*Id.* at 701.

**C. Justice Stewart's Majority Opinion in *Schneckloth*.** In any event, Justice Stewart, a bitter dissenter in *Miranda*, wrote the majority opinion for the Supreme Court on certiorari. Justice Stewart did not canvass the traditional scope or application of search and seizure constitutional protections. Instead, Justice Stewart emphasized that "the community has a real interest in encouraging consent, for the resulting search may yield necessary evidence for the solution and prosecution of crime, evidence that may insure that a wholly innocent person is not wrongly charged with a criminal offense."[145] The implication was that requiring that the state show both that there was no coercion and that the suspect knew they had the option of not consenting was rejected on the pragmatic ground that convictions could be lost.

According to Justice Stewart,

> Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.[146]

Justice Stewart further observed that the "vulnerable subjective state of the person who consents"[147] is relevant to the inquiry, including "evidence of minimal schooling, low intelligence, and the lack of any effective warnings to a

---

[145]*Schneckloth*, 412 U.S. at 243.

[146]*Id.* at 248–49.

[147]*Id.* at 229.

person of his rights."[148] Finally, Justice Stewart stated that the voluntariness test required "the most careful scrutiny" of police conduct.[149]

In contrast to *Miranda*, Justice Stewart declared that it would be unduly burdensome to require police to obtain a traditional waiver in each and every case.[150] He emphasized that in the *Miranda* custodial context, the police are often not on the open road but at the police station where they have control of the situation.[151] Yet, Justice Stewart did not recognize that most custodial arrests commence in the field as well. Indeed, this case is "Exhibit A" as to the fallacy of Justice Stewart's reasoning. Here, as is often the case, the *Miranda* requirement was triggered by custody in the field. Because of the failure to give *Miranda* rights, evidence of Hauge's statements was suppressed. If it is not "unduly burdensome" to require that *Miranda* be given in the field after a custodial arrest, why is it unduly burdensome to advise a person in the field that they have the right to refuse consent to search? The reasoning collapses.

**D. *Schneckloth* Dissents.** Three Justices dissented in *Schneckloth.* Justice Douglas, in a brief opinion, wrote that he thought whether the verbal expression of the officer should be regarded as a "courteous expression of a demand backed by force of law"[152] should be remanded to the district court for further development. Justice Brennan briefly wrote that "[i]t wholly escapes me

---

[148]*Id.* at 248.

[149]*Id.* at 229.

[150]*Id.* at 243.

[151]*Id.* at 247.

[152]*Id.* at 275–76 (Douglas, J., dissenting).

how our citizens can meaningfully be said to have waived something as precious as a constitutional guarantee without ever being aware of its existence."[153]

Justice Marshall dissented in more detail. He viewed the essential issue in the case as "whether a simple statement of assent to search, without more, should be sufficient to permit the police to search and thus act as a relinquishment of [a citizen's] constitutional right to exclude the police."[154]

Justice Marshall began his analysis by noting that the substantive question under the Fifth Amendment is whether a person is free from compulsion.[155] According to Justice Marshall, the focus, necessarily, is not on knowledge, but on compulsion.[156]

But to Justice Marshall, the question in the Fourth Amendment context is not part of the substantive meaning of the Fourth Amendment but instead was whether and under what conditions a person may elect not to assert the fundamental right to be free from government intrusion absent satisfaction of Fourth Amendment requirements.[157] For Justice Marshall, the question is not whether the state has shown there was no coercion but whether there has been an affirmative showing of consent.[158]

---

[153]*Id.* at 277 (Brennan, J., dissenting).

[154]*Id.* at 278 (Marshall, J., dissenting) (footnote omitted).

[155]*Id.* at 280–81.

[156]*Id.* at 281.

[157]*Id.* at 282.

[158]*Id.* at 283.

On the issue of consent, Justice Marshall stated that it must involve "a meaningful choice."[159] Justice Marshall found it "incomprehensible" that a decision made without knowledge is a choice at all.[160] Because concrete proof of knowledge is hard to establish, Justice Marshall would put the burden on the state to show that suspects knew they had a right to refuse to consent and that any invocation of their right to dissent would be respected.[161]

On the question of the undue burden on law enforcement, Justice Marshall noted the FBI routinely advised suspects that they had a right to refuse consent and that the caselaw showed that informing suspects of their rights does not disrupt "the casual flow of events."[162] Justice Marshall further noted that the evidence suggested that "nothing disastrous" would result if police informed subjects that they had a right to refuse consent.[163]

Justice Marshall pointed out that the "practicality" talked about in the majority opinion was really "the continued ability of the police to capitalize on the ignorance of citizens so as to accomplish by subterfuge what they could not achieve by relying only on the knowing relinquishment of constitutional rights."[164] "Of course it would be 'practical' for the police," Justice Marshall

---

[159]*Id.* at 284–85.

[160]*Id.* at 285.

[161]*Id.* at 286.

[162]*Id.* at 287.

[163]*Id.* at 287–88.

[164]*Id.* at 288.

noted, "even though the constitutional rights of innocent people also go by the board."[165]

In conclusion, Justice Marshall marked that the Fourth Amendment protection against searches without probable cause was now available only "to the sophisticated, the knowledgeable, and . . . the few."[166] Justice Marshall believed that the Fourth Amendment protections were not designed to shrink before law enforcement interests and that the balance between law enforcement and citizen interests had already been struck by the Founders and was not for the court to restrike.[167]

**E. Structural Problems with *Schneckloth*.**

1. *Vague nature of test.* The first problem with *Schneckloth* is precisely the same problem that arose in the context of *Miranda*, namely, that it provides an unworkable test. Under the "totality of the circumstances" approach to consent as that term is used in *Schneckloth*, everything is relevant and nothing is determinative. That makes it next to impossible for the test to have any predictive value. By retreating into a Rorschach-type test of "totality of the circumstances," it is the conclusion that prevails without analysis of the weight of various factors or how courts are to go about the determination of "voluntariness." For example, although *Schneckloth* declares that courts should consider the totality of the

---

[165]*Id.*

[166]*Id.* at 289.

[167]*Id.* at 290.

circumstances, including "the state of the accused's mind,"[168] the amorphous tests permit courts to concentrate on what a reasonable person would perceive as a search request.[169] The focus may be on the tone of voice of police, even though, as pointed out by Justice Souter in *United States v. Drayton,* a person who projects authority has no need to shout.[170] The *Schneckloth* formulation permits courts to focus on whether the police acted reasonably, used a calm tone of voice, and did not engage in direct coercion, rather than the true state of mind of the citizen. Further, *Schneckloth* seems to permit the courts to consider factors such as the need of the prosecution to obtain convictions, a factor that has nothing at all to do with consent. The accordion and unweighted nature of the *Schneckloth* factors and the inclusion of factors that have nothing to do with the consent of the specific individual have prompted scholars to declare that the notion of consent is "a fiction of the crudest sort—a mere device for attaining the desired legal consequence."[171]

In short, remarkably, *Schneckloth* permits the use of an unworkable standard nearly identical, but more insidious, than the one rejected in *Miranda.*[172] Thus, in *Schneckloth,* the Supreme Court approved of a standard

---

[168]*Id.* at 227 (majority opinion).

[169]Roseanna Sommers & Vanessa K. Bohns, *The Voluntariness of Voluntary Consent: Consent Searches and the Psychology of Compliance*, 128 Yale L.J. 1962, 1969 (2019) [hereinafter Sommers & Bohns].

[170]*United States v. Drayton,* 536 U.S. 194, 212 (2002) (Souter, J., dissenting). *See generally* Janice Nadler, *No Need to Shout: Bus Sweeps and the Psychology of Coercion*, 2002 Sup. Ct. Rev. 153 (2002) [hereinafter Nadler] (examining Fourth Amendment consent cases with evidence from social science).

[171]Nadler, 2002 Sup. Ct. Rev. at 156.

[172]Lynch, 5 Ohio St. J. Crim. L. at 235.

with respect to Fourth Amendment rights that was found inadequate to protect rights under the Fifth Amendment. The Fourth Amendment rights also receive less protection than rights under the Sixth Amendment. I have no doubt the federal and Iowa Framers would not have agreed with this proposition.

2. *Objective factors trump subjective questions.* Although *Schneckloth* permitted consideration of subjective factors in the totality-of-the-circumstances test, it opened the door for objective factors to override and diminish subjective factors. The totality-of-the-circumstances test gave rise to the oddball possibility that consent could be considered voluntary not because of the understanding of the suspect but because the objective behavior of the police officer is considered "reasonable." And, in determining the degree of coercion—a factor in the "voluntariness" test—the question is not focused on the state of mind of the person being searched but the reasonableness of the conduct of the police officer.[173]

Obviously, the "voluntariness" test under *Schneckloth* does not require knowledge of the options available and the consequences of complying or noncomplying. Rather than referring to consent as "voluntary," a more accurate description of the *Schneckloth* consent doctrine is that "ignorant acquiescence" is sufficient if police act reasonably. But this makes little sense. If a person, without coercion, walks onto a farmer's field and falls into a hidden sinkhole, has the citizen "voluntarily" chosen to assume the risk of a hazard that they did

---

[173]Ric Simmons, *Not "Voluntary" but Still Reasonable: A New Paradigm for Understanding the Consent Searches Doctrine,* 80 Ind. L.J. 773, 822 (2005) [hereinafter Simmons].

not know existed? Does a citizen "voluntarily" choose to surrender a right about which the citizen has no knowledge? Really?

3. *Capitalizing on ignorance.* Because a consent search under *Schneckloth* does not require the state to show that the individual knew of their right to refuse consent to search, critics claim it permits the state to capitalize on the ignorance of criminal suspects.[174] Justice Marshall, in his dissent, focused on the "peculiar"[175] nature of voluntariness without knowledge of one's right to refuse consent. As noted by Justice Goldberg in *Escobedo v. Illinois*:

> We have . . . learned the companion lesson of history that no system of criminal justice can, or should, survive if it comes to depend for its continued effectiveness on the citizens' abdication through unawareness of their constitutional rights. No system worth preserving should have to fear that if an accused is permitted to consult with a lawyer, he will become aware of, and exercise, these rights.[176]

Justice Marshall also correctly observed, as no one can really deny, that the government in *Schneckloth* sought a license to take advantage of a person's ignorance provided that the officers involved speak in a conversational tone and are generally polite. But the constitutional goal of search and seizure restrictions is not to promote good manners. Search and seizure restrictions are designed to protect the security of our bodies by ensuring that genitalia cannot generally or arbitrarily be patted down by strangers, that personal autonomy and privacy are protected from arbitrary government interference, and that the security provided

---

[174] Susan A. Bandes, *Police Accountability and the Problem of Regulating Consent Searches*, 2018 U. Ill. L. Rev. 1759, 1762 (2018) [hereinafter Bandes].

[175] *Schneckloth*, 412 U.S. at 289 n.13 (Marshall, J., dissenting).

[176] *Escobedo v. Illinois*, 378 U.S. 478, 490 (1964).

by the constitution in our homes, papers, persons, and effects is a reality in day-to-day life.

In short, a gentleman thief may be entertaining, but is still as much of a thief as a coarser character. Similarly, a polite officer who violates search and seizure law by doing an impermissible search commits the same violation as a gruff officer who is less sympathetic but engages in the same illegal conduct. A person who cuts your constitutional throat may be very nice about it, but that shouldn't matter in determining whether a constitutional violation occurred, should it? So I say enough about the talk about manners. We need more talk about substance.

4. *Pragmatic goal of obtaining convictions.* The *Schneckloth* majority seemed to suggest that a waiver standard would lead to fewer convictions.[177] Most consent searches, of course, yield nothing, and as a result, nothing would be lost in these cases by informing a citizen of the right to refuse consent. In cases where incriminating evidence was uncovered through a "consent" search, the same evidence might well have been available through a search incident to arrest or other lawful means. So the alleged losses resulting from advising citizens of their constitutional rights at the time *Schneckloth* was decided were quite speculative at best.

However, as has been stated by one scholar, the "appropriate metric" of search and seizure law cannot be "high clearance rates."[178] If that were the

---

[177] *Schneckloth*, 412 U.S. at 245–46 (majority opinion).

[178] Bandes, 2018 U. Ill. L. Rev. at 1764.

metric, our entire constitutional structure as it relates to criminal prosecutions would be pulled down. The right to counsel, the right to a jury trial, the right to a speedy trial, the right to fair notice, and the right to be free from arbitrary government search and seizure all, to some degree, on some occasions, make criminal prosecution more difficult.

I am convinced that the Founders would have been shocked by the relaxation of search and seizure principles to promote law enforcement. Indeed, that is *exactly* what general warrants and writs of assistance were designed to do: make revenue collection of the Crown more efficient and effective. Collecting revenues from colonists to defray the cost of an expensive empire was a high priority of the Crown; in the view of British enforcers and their local enablers, personal liberties fell to the wayside in order to satisfy the pragmatic demands of the government. In short, the royalists weighed the pressing needs of the Crown against the rights of colonists, and they concluded that the needs of the Crown prevailed. That is the kind of reasoning employed by today's majority.

The idea that the contours of Bill of Rights provisions should be shaved to advance government policy or enforce laws is inconsistent with the traditional view of Frankfurter and others that hindsight does not shape the scope of constitutional rights. As noted in *Mincey v. Arizona*:

> [T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. The investigation of crime would always be simplified if warrants were unnecessary. But the Fourth Amendment reflects the view of those who wrote the Bill of Rights that the privacy of a person's home and

property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law.[179]

Further, as noted by Professor Susan Bandes, *Schneckloth* relied on two questionable empirical assumptions. First, the assumption was that without consent searches, there would be a drop in the resolution of crimes.[180] Second, if persons were advised of their right to refuse consent, there would be a precipitous drop in consent searches.[181] The Supreme Court had no empirical evidence to support these "sky is falling" speculations and, as will be seen below (and to no one's surprise), the speculations have been shown to be demonstrably incorrect.

So, it is imperative that we avoid shortcuts and "wink wink" efficiencies under pressure from the government in order to promote law enforcement policies. Indeed, the Framers knew there would be majoritarian political pressures to the contrary, and that is why search and seizure principles were cemented into our constitutions. We must view constitutional principles as not so pliable to bend under every pragmatic pressure. Otherwise, for instance, "in our zeal to conduct a war on drugs, the Constitution is the principal victim."[182]

5. *Consent searches as inherently coercive.* Many scholars have noted that the interactions between police and citizens are inherently coercive. In a seminal piece of scholarship, Professor Marcy Strauss acknowledged the "simple truism

---

[179]*Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (citation omitted).

[180]Bandes, 2018 U. Ill. L. Rev. at 1765.

[181]*Id.*

[182]*United States v. Barona*, 56 F.3d 1087, 1099 (9th Cir. 1995) (Reinhardt, J., dissenting).

that many people, if not most, will always feel coerced by police 'requests' to search."[183]

At the time of *Schneckloth,* there was a body of authority suggesting that an encounter between a police officer and a citizen might be sufficiently unbalanced to impact the issue of consent. Indeed, the Ninth Circuit was onto this theory, recognizing the obvious truth that the phrase "May I" used by a person of authority may be a command.[184] And, of course, in *Miranda,* the court recognized the inherently coercive nature of custodial interrogation even without physical coercion.[185] The majority in *Schneckloth* seemed well aware of the possibility of informal coercion but simply regarded it as a factor in the "totality of the circumstances" stew that could be overwhelmed by the strong prices of pragmatism and the need to obtain convictions. While *Miranda* recognized psychological coercion and developed a remedy for it, *Schneckloth* recognized psychologic coercion and relegated it to insignificance.

6. *Wide discretion in multifactor test provides environment for arbitrary enforcement.* It is universally recognized that traffic violations are so ubiquitous and unavoidable that police can stop just about everyone on the open road by simply following a vehicle for a period of time. Because of this, this police

---

[183]Marcy Strauss, *Reconstructing Consent*, 92 J. Crim. L. & Criminology 211, 221 (2002) [hereinafter Strauss].

[184]*Bustamonte*, 448 F.2d at 701.

[185]*Miranda*, 384 U.S. at 467.

authority has been regarded as a modern general warrant for police to seize motorists on the open road.[186]

On top of the extraordinarily broad discretion to stop vehicles based on the most minor equipment violation, *Schneckloth* added another remarkable layer of police discretion: the extraordinarily broad discretion to seek "consent" to search from any motorist who has been selectively stopped over traffic violations. The risk of arbitrary search and seizure posed by the combination of the judicially unregulated power to pull people over with the judicially unregulated efforts to seek consent presents a geometric rather than a mathematical proposition. These double-barreled general discretions would have shocked the Framers who resisted arbitrary police power and insisted on strong judicial supervision through the warrant and probable cause requirements.

7. *Reasonable person as intelligent, white, and male. Schneckloth*'s analysis emphasizes what a reasonable person would believe in light of the nature of the police encounter. But, how the "reasonable person" would behave or feel during interaction with police is effectively judged from "the perspective of the middle-class white person expecting police protection rather than the poor person familiar with police abuse."[187]

---

[186]Barbara C. Salken, *The General Warrant of the Twentieth Century?, A Fourth Amendment Solution to Unchecked Discretion to Arrest for Traffic Offenses*, 16 Pace L. Rev. 97, 141–42 (1997).

[187]Andrew E. Taslitz, *Respect and the Fourth Amendment*, 94 J. Crim. L. & Criminology 15, 56 (2003).

This case does not involve an African-American. Nonetheless, the principles in this case will apply to African-Americans. If so, it is essential that our approach to "consent" or "waiver" is broad enough to take into account cultural factors that affect the exercise of constitutional rights. For instance, there is a general fear and distrust of law enforcement in the African-American community. As noted by Justice Sotomayor in *Utah v. Strieff*,

> For generations, black and brown parents have given their children "the talk"—instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them.[188]

As noted by Minnesota Supreme Court Justice Alan Page, "I speak from the perspective of an African-American male who was taught by his parents that, for personal safety, . . . it is best to comply carefully and without question to the officers' request."[189] Or, consider the comment of Judge Julia Mack, the first African-American woman to serve on the District of Columbia Court of Appeals, who has observed that "no reasonable innocent black male (with any knowledge of American history) would feel free to ignore or walk away" from police officers conducting a bus sweep.[190] In short, African-Americans act out of fear of how an officer with a gun will react to them. They may believe that consenting to requests is the only way a Black person can demonstrate innocence. Thus, the "reasonable person" factor suggested in *Schneckloth* is overbroad and does not

---

[188]*Utah v. Strieff*, 579 U.S. 232, 254 (2016) (Sotomayor, J., dissenting).

[189]*State v. Harris*, 590 N.W.2d 90, 106 n.4 (Minn. 1999) (en banc) (Page, J., dissenting).

[190]*In re J.M.*, 619 A.2d 497, 513 (D.C. 1992) (en banc) (Mack, J., dissenting, but concurring in the order of remand).

consider the realities of the Black experience in the search and seizure situation. The point here is that a stereotyped conception of a universally applicable "reasonable person" is not the proper way to approach consent.

8. *Obtaining knowing, voluntary consent is not "thoroughly impractical."* Justice Stewart in *Schneckloth* stated that it would be "thoroughly impractical" to require a *Miranda*-type warning by police seeking consent to search.[191] The claim had no empirical support when made, and even less so today. Police officers routinely issue traffic citations that document violations and provide notice to violators about necessary court proceedings. The FBI, as pointed out by Justice Marshall, had informed investigation subjects of their right to decline when asking for consent to search with no apparent difficulties.[192]

At the time *Schneckloth* was decided, there was no reason why law enforcement could not document that they advised drivers about their right to decline a request for a search and that a refusal would be honored. As Drake Professor James Adams noted, the notion that warnings were thoroughly impractical "strains credulity."[193] Perhaps, as Justice Stewart candidly stated, there was a lack of will, or a desire, to issue warnings to advance the goals of law enforcement. It is, therefore, hard to take at face value the impracticability argument.

---

[191] *Schneckloth*, 412 U.S. at 231.

[192] *Id.* at 287 (Marshall, J., dissenting).

[193] James A. Adams, *Search and Seizure As Seen by Supreme Court Justices: Are They Serious or Is This Just Judicial Humor?*, 12 St. Louis U. Pub. L. Rev. 413, 473 (1993).

9. *Summary.* For all the above reasons, it is my view that *Schneckloth* was wrongly decided. Since *Schneckloth*, there have been additional developments that require us to step back and take another look at the case. First, the subsequent caselaw indicates—apparent even at the time of the decision—that *Schneckloth* factors are highly malleable. Second, our empirical knowledge about matters such as social psychology and racial profiling has dramatically increased and yet offered no support for *Schneckloth*. Finally, experience and technological innovation have destroyed any plausible assertion that informing citizens of their constitutional rights is thoroughly impracticable. If *Schneckloth* was fictitious when decided, and has become even more surreal in light of modern developments, its indefensible logic must be rejected.

**IV. Empirical Developments Since *Schneckloth*.**

**A. Empirical Evidence on Whether Warnings Are "Thoroughly Impractical."** The notion that notifying a person of the right to refuse consent was "thoroughly impractical" was never convincing. Experience in the years following *Schneckloth* has demolished the argument. Not surprisingly, in response to caselaw, law enforcement authorities in New Jersey developed a consent to search form that advised individuals of their right to refuse consent to search. Such consent forms have emerged in many jurisdictions.

Scholars Nancy Leong and Kira Suyeishi conducted a survey published in 2013 of state police departments regarding the use of consent to search forms.[194]

---

[194]Nancy Leong & Kira Suyeishi, *Consent Forms and Consent Formalism*, 2013 Wis. L. Rev. 751, 752–54 (2013).

Based on their responses, they determined that only four state police departments do not use consent forms.[195] Fifteen state police departments use forms but they are not mandatory in all instances.[196] One state (Texas) reported the unusual arrangement that whether to use a consent form is up to the district attorney.[197]

Leong and Suyeishi noticed that in five states, the state police departments used either a consent form or an audio or visual recording.[198] Twelve states required officers to use consent forms.[199] Louisiana required that two officers be present in addition to obtaining consent prior to a consent search.[200]

In addition to these state practices by state police departments, many local jurisdictions have adopted policies related to written consent forms. Written consent forms have been utilized by numerous state police departments across the country such as St. Paul, Minnesota; Austin, Texas; and several communities in North Carolina.[201] Numerous settlements between police departments and the Department of Justice have required knowing consent to be obtained after traffic stops. Obviously, experience demonstrates that it is not impractical to document informed consent on the street. Finally, the 2015

---

[195]*Id.* at 774.

[196]*Id.* at 775.

[197]*Id.* at 776.

[198]*Id.* at 776–77 (including Idaho, Nevada, Oklahoma, South Dakota, and West Virginia).

[199]*Id.* at 777 (including Arkansas, Arizona, California, Colorado, Hawaii, Iowa, Louisiana, Maryland, New Jersey, Ohio, Vermont, and Washington).

[200]*Id.*

[201]Bandes, 2018 U. Ill. L. Rev. at 1775.

President's Task Force Final Report on Twenty-First Century Policing recommended that officers obtain written acknowledgment that a person has a right to refuse consent when there is no warrant or probable cause.[202]

Further, the advent of personal video and dashcams have made it plain vanilla standard for police to record the interaction between police and a motorist. Indeed, in this very case, videocam evidence is available. In New Jersey, for instance, all motor vehicle stops must be video recorded.[203] The idea that determining what in fact happened as part of the encounter is an impossible or even difficult undertaking is simply no longer true. Just as videos of *Miranda* warnings and subsequent interrogations often assist law enforcement, one could expect the same to be true with respect to consent-to-search transactions.

It is doubtful that impact on convictions is an appropriate measure of the scope of a constitutional right. Yet, even if it were, as with *Miranda*, there is a body of empirical evidence that demonstrated that the fear that invocation of constitutional rights would dramatically tie the hands of law enforcement and prevent effective prosecution is simply untrue.[204] For example, a study of the impact of warning requirements for searches in Ohio reveals that such impact

---

[202]Office of Cmty. Oriented Policing Servs., *Final Report of the President's Task Force on 21st Century Policing* 27 (2015), https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf [https://perma.cc/B8MZ-GBA6] (cited in Diana R. Donahoe, *Not-So-Great Expectations: Implicit Racial Bias in the Supreme Court's Consent to Search Doctrine*, 55 Am. Crim. L. Rev. 619, 660 & n.311 (2018)).

[203]Matthew Phillips, *Effective Warnings Before Consent Searches: Practical, Necessary, and Desirable*, 45 Am. Crim. L. Rev. 1185, 1199–200 (2008) [hereinafter Phillips].

[204]*Id.* at 1203–10.

was small.[205] In New Jersey, where consent forms have been used for some time, law enforcement monitors over fifteen reporting periods from 1999 to 2007 concluded that 88.3% of the motorists consented to search.[206] So, the available empirical evidence undercuts a claim that advising a person of the right to refuse consent leads to a dramatic decrease in consent searches. In this regard, the evidence is much like that regarding *Miranda* warnings, which appear to have a limited collective impact on the statistical willingness of persons in custody to talk to police.[207] The law enforcement sky has not fallen with *Miranda*, and it would not fall by advising persons of their right to refuse consent to search.

The bottom line is that advising a person that they have a right to withhold consent to search and that the refusal would be honored is not "thoroughly impractical." Indeed, it never was. Subsequent events demonstrate that it's time for this charade to come to an end. The legitimacy of the law is undermined when it rests on such unsupported reasoning.

**B. Developments in Social Psychology.** Since *Schneckloth*, there has been an "ever-widening gap between Fourth Amendment consent jurisprudence . . . and scientific findings about the psychology of compliance."[208] Milgram's[209]

---

[205]Illya Lichtenberg, Miranda *in Ohio: The Effects of* Robinette *on the "Voluntary" Waiver of Fourth Amendment Rights*, 44 How. L.J. 349, 366–67 (2001) [hereinafter Lichtenberg].

[206]Phillips, 45 Am. Crim. L. Rev. at 1201.

[207]*See* Schulhofer, 90 Nw. U. L. Rev. at 502 ("For all practical purposes, *Miranda*'s empirically detectable harm to law enforcement shrinks virtually to zero.").

[208]Nadler, 2002 Sup. Ct. Rev. at 155.

[209]Stanley Milgram, *Obedience to Authority: An Experimental View* 13–26 (1974).

and Brickman's[210] studies of obedience, published just after *Schneckloth*, showed "people will obey authority even when it is not in their own best interest to do so."[211] Although Milgram's and Brickman's studies were conducted in a laboratory setting and did not involve traffic stops, the obedience theory advanced by the studies indicated that humans tend to comply with what they see as an authority at a rate higher than expected.[212]

There is empirical evidence to support the notion that obedience theory concretely applies in the context of traffic stops and requests for consent searches by police. In an often-cited study on traffic stops and consent searches in Ohio, Illya Lichtenberg reached a number of conclusions.[213] As summarized by Tracey Maclin, Lichtenberg's research revealed:

> [M]otorists in Ohio consent to searches of their automobiles during traffic stops "for one primary reason: fear of reprisal if they refused." His data also revealed that motorists were "unaware of their legal right to refuse," believed that "refusals [to allow searches] are futile," "fear[ed] police reprisal or added inconvenience from a refusal," and "[a]lmost none of the subjects [surveyed] felt that the officer would honor their decision to refuse." In other words, "most motorists believed that the search [would] be conducted with or without their consent."[214]

---

[210]Leonard Bickman, *The Social Power of a Uniform*, 4 J. Applied Soc. Psych. 47–61 (1974).

[211]Strauss, 92 J. Crim. L. & Criminology at 236.

[212]*Id.* at 239–40.

[213]Lichtenberg, 44 How. L.J. at 373–74.

[214]Maclin, 39 McGeorge L. Rev. at 79 (second, third, fourth, fifth, sixth alteration in original) (footnotes omitted) (quoting Illya Dionysus Lichtenberg, *Voluntary Consent or Obedience to Authority: An Inquiry Into the "Consensual" Police-Citizen Encounter* 250, 275 (Oct. 1999) (unpublished Ph.D. dissertation, Rutger's University)).

Many scholars have concluded that encounters between police and individuals in the context of traffic stops are so imbalanced that any notion of voluntary consent is doubtful.[215]

Language theory echoes the social-psychological finding on obedience. What a police officer phrases gently as a request may well be interpreted as a command. As Janice Nadler has persuasively argued in a seminal article written more than twenty-five years after *Schneckloth*, a boss who says to a subordinate employee "try not to be late again" is not likely to be perceived as making a suggestion regardless of the language utilized.[216] In other words, "those who have authority apparently need not activate coercive potential through their discourse[; t]heir roles are sufficient to do so."[217] A uniformed officer's request "however gently phrased, is likely to be taken by even the toughest citizen as a command."[218] Certainly, when a uniformed officer approaches a vehicle with

---

[215]*See, e.g.*, Adrian J. Barrio, *Rethinking* Schneckloth v. Bustamonte*: Incorporating Obedience Theory into the Supreme Court's Conception of Voluntary Consent*, 1997 U. Ill. L. Rev. 215, 247 (1997) [hereinafter Barrio] ("[T]he weight of scientific authority suggests that a suspect's ignorance of fundamental Fourth Amendment rights must be viewed as a state of mind that renders a suspect's consent involuntary."); John M. Burkoff, *Search Me?*, 39 Tex. Tech. L. Rev. 1109, 1138 (2007) [hereinafter Burkoff] ("[M]ost people do not expect that they have 'the right not to accede a police officer's request that a search be authorized.' "); Wayne R. LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1902 (2004) ("It is . . . nonsensical for courts to continue their embrace of the . . . position that a reasonable motorist, having been seized, would conclude he was free to leave (even though not told so) in the face of ongoing police interrogation."); Maclin, 39 McGeorge L. Rev. at 28 ("[E]veryone . . . knows . . . [that] a police 'request' to search a bag or automobile is understood by most persons as a 'command.' ").

[216]Nadler, 2002 Sup. Ct. Rev. at 188–90.

[217]*Id.* at 189 (quoting Jennifer L. Vollbrecht, Michael E. Roloff, & Gaylen D. Paulson, *Coercive Potential and Face Threatening Sensitivity: The Effects of Authority and Directives in Social Confrontations*, 8 Int'l. J. Conflict Mgmt. 235, 244 (1997)).

[218]H. Richard Uviller, *Tempered Zeal: A Columbia Law Professor's Year on the Streets with the New York City Police* 81 (1988).

flashing emergency lights on an open road and says, "Can I please see your license and registration?" the officer is not seeking consent but has made a command.[219] What is literally phrased as a request from a person in authority does not imply a right to refuse, as stated in *Schneckloth.* That concept is simply wrong.[220]

It thus seems clear that the treatment of the officer's language in *Schneckloth* was very dubious.[221] The officer never made a specific request for consent to search but simply asked if the trunk could be opened. Although phrased as a question, the impact of these words on a person pulled over at the roadside is a command to open the trunk, not a request for permission.[222]

**C. Remarkable Applications of *Schneckloth.*** The *Schneckloth* test, as applied by the lower courts, has proven to be insufficiently protective of

---

[219]*See* Alafair S. Burke, *Consent Searches and Fourth Amendment Reasonableness*, 67 Fla. L. Rev. 509, 530 (2015).

[220]*See* Peter M. Tiersma & Lawrence M. Solan, *Cops and Robbers: Selective Literalism in American Criminal Law*, 38 Law & Soc'y Rev. 229, 239–48 (2004) (noting that commands and requests are often indistinguishable—"when someone in a position of power 'asks' or 'requests' us to do something, it will normally be interpreted as a command").

[221]*See* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(i) (6th ed. 2020) ("Perhaps the most telling criticism of [the] ruling in *Schneckloth* . . . is that the Court 'misapprehended the potential for psychological coercion in the context of consent searches.' . . . [T]here is much to be said for the conclusion that to 'curb the coercive power of police authority, the police officer should be required to advise the suspect of his right to withhold consent prior to requesting his permission to search.' " (quoting Barrio, 1997 U. Ill. L. Rev. at 218, 247)); Nadler, 2002 Sup. Ct. Rev. at 155 (noting that "the ever-widening gap between Fourth Amendment consent jurisprudence . . . and scientific findings about the psychology of compliance and consent"); Simmons, 80 Ind. L.J. at 775 (stating that the nearly unanimous condemnation "threatens to undermine the integrity of judicial review of police behavior"); *see also State v. Jenkins*, 3 A.3d 806, 876–78 (Conn. 2010) (Palmer, J., dissenting).

[222]Strauss, 92 J. Crim. L. & Criminology at 235 (noting that *Schneckloth* "ignor[es] the most significant factor of all: the inevitability that individuals will feel coerced simply by virtue of dealing with an authority figure like the police"); Barrio, 1197 U. Ill. L. Rev. at 247; *see also Jenkins*, 3 A.3d at 876–78.

constitutional search and seizure protections.[223] Remarkably, in *United States v. Barnett,* the First Circuit Court of Appeals held that a consent to search was voluntary when seven or eight officers held the suspect at gunpoint.[224] Unfortunately, *Barnett* is not an outlier. In *United States v. Perea,* five officers surrounded the defendant, drew their guns, pointed the police vehicles' spotlights in his face, and handcuffed him.[225] And miraculously, the court held that the consent obtained was voluntary.[226] In *Manzi v. State,* the Texas appellate court affirmed a conviction based upon a search where law enforcement arrested the defendant at gunpoint, handcuffed him, and told him his girlfriend would be arrested if he did not consent to search.[227] It seems some courts find *Schneckloth* sufficiently "murky and ill-defined" to accommodate these fact patterns.[228]

**D. Data on Disproportionate Impact.** As noted above, this case does not involve a minority driver. But, wide-open, discretionary traffic stops combined with wide-open, discretionary requests for consent searches create a regime that permits, if not promotes, racial disproportionality. Since *Schneckloth* was decided, a body of empirical information has been gathered from multiple jurisdictions that collectively adds greater depth to our understanding of racial

---

[223]*See generally* Burkoff, 39 Tex. Tech. L. Rev. at 1127 n.66 (identifying several state and federal cases where the defendant was held to have voluntarily consented inherently coercive circumstances such as being handcuffed and held at gunpoint).

[224]*United States v. Barnett*, 989 F.2d 546, 555–56 (1st Cir. 1993).

[225]*United States v. Perea*, 374 F. Supp. 2d 961, 968–69 (D.N.M. 2005).

[226]*Id.* at 977–79.

[227]*Manzi v. State*, 56 S.W.3d 710, 713–14, 719 (Tex. App. 2001).

[228]Sommers & Bohns, 128 Yale L.J. at 1969.

profiling. In isolation, each study has its limitations, but collectively, they offer persuasive evidence that racial profiling is a real problem.

Perhaps not surprisingly, post-*Schneckloth* statistical studies show that African-Americans are disproportionately stopped for traffic violations. Studies involving drivers in Colorado,[229] Florida,[230] Illinois,[231] Maryland,[232] and New Jersey,[233] all show that African-Americans are stopped for minor traffic violations at a rate markedly disproportionate compared to white drivers. A recent study suggests that when Washington caselaw expanded police discretion to make traffic stops, the number of African-American drivers stopped increased disproportionately compared to white drivers.[234] The authors conclude that the data are a "sobering reminder" that standards granting police discretion "may come at the cost of inequality in our justice system."[235]

---

[229]David A. Harris, *"Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops*, 87 J. Crim. L. & Criminology 544, 568–69 (1997).

[230]*Id.* at 561–63.

[231]*See Racial Disparity in Consent Searches and Dog Sniff Searches*, ACLU Illinois (Aug. 13, 2014), https://www.aclu-il.org/en/publications/racial-disparity-consent-searches-and-dog-sniff-searches (noting that Black and Hispanic motorists are almost twice as likely to be consent searched yet white motorists were 49% more likely than Black motorists and 56% more likely than Hispanic motorists to be found with contraband).

[232]*See* Samuel R. Gross & Katherine Y. Bames, *Road Work: Racial Profiling and Drug Interdiction on the Highway*, 101 Mich. L. Rev. 651, 687, 689 (2002) (finding that Black drivers are stopped twice as often as white drivers on I-95 and are much more likely to be searched even though the rate at which drugs are found is about the same as for whites).

[233]*State v. Soto*, 734 A.2d 350, 352–54 (N.J. Super. Ct. Law Div. 1996) (discussing studies performed to prove allegedly discriminatory enforcement of traffic laws by the New Jersey state police).

[234]Stephen Rushin & Griffin Edwards, *An Empirical Assessment of Pretextual Stops and Racial Profiling*, 73 Stan. L. Rev. 637, 655–57, 683–90 (2021).

[235]*Id.* at 705.

Studies also show that African-Americans are asked to consent to searches more often than white drivers are. As we noted in *Pals*, statistical studies in Illinois, Minnesota, and Rhode Island and a study by the Department of Justice all show that minority drivers are the subject of consent searches at a far higher rate than whites even though consent searches of whites were more likely to produce contraband.[236] Since then, a recent meta-study of eight states shows that Black drivers stopped were 2.4 times, and Hispanic drivers 2.2 times, more likely to be asked for consent searches than white drivers.[237]

These data collectively suggest that the nearly unlimited authority to make discretionary stops for traffic violations and the unlimited discretionary authority to expand the stops to the investigation of drugs combine to disproportionately affect African-Americans.

While many of the statistical studies are outside Iowa, there is a reason for concern in this state. In Iowa City, a study showed that minority drivers were stopped disproportionately to white drivers and that they were 3.45 times more

---

[236]Eamon Kelly, *Race, Cars and Consent: Reevaluating No-Suspicion Consent Searches*, 2 DePaul J. Soc. Just. 253, 274 ("[W]hite drivers were more likely to yield contraband than searches of minority drivers. The Rhode Island study found that 23.5% of all searches of white drivers revealed contraband. Yet, Rhode Island law enforcement officers only found contraband in 17.8% of the searches of minority motorists. The Minnesota study noted 'disparities in discretionary search rates are particularly troubling' because there was a lower probability that these discretionary searches would yield contraband. Overall, the Minnesota study found 24% of discretionary searches of whites produced contraband compared to only 11% for African Americans, 12% for Asian Americans[,] and 9% for Latinos. In Illinois, consent searches of minorities were half as likely to uncover contraband as searches of whites." (footnotes omitted) (quoting Council on Crime & Justice & Inst. on Race & Poverty, *Minnesota Statewide Racial Profiling Report: All Participating Jurisdictions* 1 (2003), https://static.prisonpolicy.org/scans/ccj/Racial%20Profiling%20Study.pdf [https://perma.cc/QYS2-FNHN])).

[237]Emma Pierson et al., *A Large-Scale Analysis of Racial Disparities in Police Stops Across the United States*, 4 Nature Hum. Behav. 736, 738 (2020), https://www.nature.com/articles/s41562-020-0858-1 [https://perma.cc/449P-D2T6].

likely to be asked to consent to search during the vehicle stop.[238] A recent traffic stop study of Iowa State University and Ames police also found disproportionality in arrest.[239] The study showed that people of color, excluding Asians, were 46% more likely to be arrested by the police while driving.[240] Although the Iowa studies are fragmentary, they are consistent with the larger body of data strongly suggesting that African-Americans are disproportionately stopped and searched by police.

We should not be surprised by these developments. Lord Acton's phrase that "[p]ower tends to corrupt and absolute power corrupts absolutely"[241] may be remodeled to say, in the context of traffic stops, "police discretion leads to arbitrary searches and seizures and the greater the discretion, the greater the problem."

---

[238]Mitchell Schmidt, *Study Shows Racial Disparity In Traffic Stops By ICPD*, Iowa City Press-Citizen (June 17, 2014), https://www.press-citizen.com/story/news/local/2014/06/17/study-shows-racial-disparity-traffic-stops-icpd/10705257 [https://perma.cc/DG2Z-KBD7] (citing Chris Branum, Robert Perfetti, & Matt Lint, *Iowa City Police Department Traffic Study: 2005, 2006, 2007, 2010, 2011, & 2012*, St. Ambrose Univ. 54 (2014), https://www8.iowa-city.org/weblink/0/doc/1481387/Electronic.aspx [https://perma.cc/C43S-KHGG]). The data on whether each search was based on consent or probable cause was incomplete, however, preventing definitive conclusions from being made.

[239]Danielle Gehr, *Ames, ISU Police Study Finds Disproportional Arrest Data But Little Evidence of Traffic Stop Bias*, Ames Tribune (Feb. 11, 2022), https://www.amestrib.com/story/news/2022/02/11/racial-profiling-ames-isu-pd-release-traffic-stop-bias-study-results/6750068001/ [https://perma.cc/6S8H-6E4F].

[240]*Id.*

[241]Letter from John Emerich Edward Dalberg to Archbishop Mandell Creighton (Apr. 5, 1887), https://history.hanover.edu/courses/excerpts/165acton.html [https://perma.cc/2JX8-8K3K].

**V. State Constitutional Alternatives to *Schneckloth* (Fourteen Departures).**

**A. Introduction.** Article I, section 8 of the Iowa Constitution is similar, though not identical, to the Fourth Amendment to the United States Constitution. As a state supreme court, we are the final arbiter of the meaning of the state constitution. The question is whether we should take an approach to consent searches that departs from *Schneckloth* and its progeny. As the United States Supreme Court has dramatically lessened the scope of protections under the Fourth Amendment, some state supreme courts have resisted. Indeed, according to one recent study, there are 125 cases in a total of thirty-seven states involving questions where federal search and seizure precedent was "[n]ot followed on state law grounds."[242] Only thirteen states remain, either through express holding or through lock-stepping state constitutional interpretation to federal caselaw.[243] Iowa has been listed in the study as "not following" federal search and seizure precedent on fourteen occasions, making it fall in the middle of the pack of states engaged in independent state constitutional interpretation.[244]

These state court cases are a virtual cornucopia of material to highlight interpretive options that are available under state law. In order to enlighten the

---

[242]LaKeith Faulkner & Cristopher R. Green, *State-Constitutional Departures from the Supreme Court: The Fourth Amendment*, 89 Miss. L.J. 197, 198 (2020) [hereinafter Faulkner & Green]. The authors do not include in their study occasions where state courts have, according to Westlaw, merely distinguished federal precedent. *See also* Michael J. Gorman, *Survey: State Search and Seizure Analogs*, 77 Miss. L.J. 417 (2007).

[243]Faulkner & Green at 212.

[244]*Id.* at 211 & n.163.

discussion, I review cases in other states that depart from *Schneckloth v. Bustamante* to gain insight on the best course for Iowa in this case. As will be seen below, at least fourteen states, including Iowa, have decided to depart in some fashion from the federal model in considering search and seizure issues under their state constitutions related to consent searches.

**B. New Jersey: Double-Barreled Adoption of Waiver and Reasonable Suspicion Requirements for Consent Searches.** Shortly after the United States Supreme Court decided *Schneckloth*, the New Jersey Supreme Court in *State v. Johnson*[245] considered a question of consent to search under article I, section 7 of the New Jersey Constitution. Like article I, section 8 of the Iowa Constitution, the search and seizure provision of the New Jersey Constitution was "taken almost verbatim" from the Fourth Amendment.[246]

In *Johnson*, the New Jersey Supreme Court determined to use the traditional waiver principles in connection with consent searches.[247] According to the *Johnson* court, "Many persons, perhaps most, would view the request of a police officer to make a search as having the force of law."[248] The *Johnson* court stated that police would not necessarily be required to advise the person of the right to refuse consent in all instances, but the burden of proving knowledge

---

[245]*State v. Johnson*, 346 A.2d 66 (N.J. 1975).

[246]*Id.* at 68 n.2.

[247]*Id.* at 68.

[248]*Id.*

rested with the state.[249] As a result of the ruling, however, the New Jersey state police developed a consent to search form to conform to the *Johnson* ruling.[250]

Still, this is not the end of the story. The New Jersey Supreme Court again revisited this issue in *State v. Carty*.[251] In *Carty*, the New Jersey court held that in the context of a traffic stop, even the protections of an explicit warning from police were insufficient.[252] According to the *Carty* court, "where the individual is at the side of the road and confronted by a uniformed officer seeking to search his or her vehicle, it is not a stretch of the imagination to assume that the individual feels compelled to consent."[253]

The *Carty* court cited data that even with warnings developed in New Jersey, up to ninety-five percent of motorists agreed to consent searches.[254] The *Carty* court concluded that warnings alone are not sufficient to overcome the inherent coerciveness of a traffic stop.[255] "[W]here the individual is at the side of the road and confronted by a uniformed officer . . . , it is not a stretch of the imagination to assume that the individual feels compelled to consent."[256] The first-tell-then-ask rule and the *Johnson* standard, according to the *Carty* court, "are either not voluntary because people feel compelled to consent for various

---

[249]*Id.*

[250]*State v. Carty*, 790 A.2d 903, 907 (N.J. 2002) (describing the consent form developed in response to *Johnson*).

[251]*Id.* at 905.

[252]*Id.* at 911.

[253]*Id.* at 910.

[254]*Id.* at 910–11.

[255]*Id.* at 911.

[256]*Id.* at 910.

reasons, or are not reasonable because of the detention associated with obtaining and executing the consent search."[257]

As a result, the *Carty* court declared that before police could seek a consent search in the context of an automobile stop, there must first be reasonable and articulable suspicion that would satisfy *Terry v. Ohio.*[258] The *Carty* court declared:

> The requirement of reasonable and articulable suspicion is derived from our State Constitution and serves to validate the continued detention associated with the search. It also serves the prophylactic purpose of preventing the police from turning a routine traffic stop into a fishing expedition for criminal activity unrelated to the stop.[259]

**C. Ohio: Totality of the Circumstances "With Teeth."** The Ohio Supreme Court has departed from the approach of the United States Supreme Court in the context of a consent search arising from a traffic stop. In *Ohio v. Robinette*, a police officer made a traffic stop of a speeder, Robinette.[260] Robinette produced a valid license and registration.[261] The detective asked Robinette to step toward the back so the detective could videotape a warning for the speeding violation.[262] After videotaping the warning, the detective turned to Robinette and the following colloquy occurred:

---

[257]*Id.* at 911.

[258]*Id.* at 912.

[259]*Id.*

[260]*Ohio v. Robinette*, 519 U.S. 33, 35 (1996).

[261]*Id.*

[262]*Id.*

[Q.] One question before you get gone. Are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?

[A.] No.

[Q.] Can I search your car?

[A.] Yes.[263]

The search produced marijuana, and, after a dog sniff, one dose of meth.[264]

Robinette was charged with drug crimes and was convicted.[265] The Ohio Court of Appeals reversed on the ground that law enforcement extended the stop beyond that needed to resolve the traffic infraction.[266] The Ohio Supreme Court affirmed on a different ground. According to the Ohio Supreme Court, Robinette was entitled to a declaration that he was free to go before the officer engages in a casual encounter regarding drugs.[267] In other words, the approach of the Ohio Supreme Court was "first tell, then ask." The ruling was based on both the Fourth Amendment and the search and seizure provision of article I, section 14 of the Ohio Constitution.

The United States Supreme Court reversed the Ohio Supreme Court with respect to the Fourth Amendment.[268] According to the *Robinette* Court, there is no per se requirement that drivers be advised that they may leave to support the

---

[263]*See* Lassiter, 39 Tex. Tech. Rev. at 1182 & n.90 (quoting videotape on file with author).

[264]*Id.* at 1183.

[265]*Robinette*, 519 U.S. at 36.

[266]*State v. Robinette,* 653 N.E.2d 695, 696 (Ohio 1995), *rev'd*, 519 U.S. 33 (1996).

[267]*Id.* at 699.

[268]*Robinette,* 519 U.S. at 35.

validity of the consent to search under the Fourth Amendment.[269] The Supreme Court repeated language from *Schneckloth* that knowledge of a right to refuse was a factor in the totality-of-the-circumstances calculation and that requiring a warning "would be thoroughly impractical."[270] The Supreme Court vacated the judgment of the Ohio Supreme Court and remanded the case for further proceedings.

On remand, the Ohio Supreme Court took a different tact.[271] The Ohio Supreme Court backed off from its previous declaration that a statement that the driver is free to leave is mandatory.[272] However, the Ohio Supreme Court emphasized that many law enforcement agencies engage in the practice of obtaining written consent.[273] Further, the Ohio Supreme Court emphasized that the lack of any warning weighs heavily in the mix of determining the totality of the circumstances.[274] Ultimately, the Ohio Supreme Court affirmed its prior result on different grounds.[275] This time, however, the Ohio Supreme Court relied solely on the Ohio Constitution, thereby avoiding further United States Supreme Court review.[276] *Robinette* represents an application of the totality-of-the-circumstances test of *Schneckloth* "with teeth."

---

[269]*Id.* at 39–40.

[270]*Id.*

[271]*State v. Robinette*, 685 N.E.2d 762, 766–67 (Ohio 1997).

[272]*Id.* at 771.

[273]*Id.* at 771 n.6.

[274]*See id.* at 771 & n.6.

[275]*Id.* at 771–72.

[276]*Id.* at 771.

**D. Mississippi: Knowledgeable Waiver.** The Mississippi Supreme Court has rejected *Schneckloth*.[277] In declining to follow *Schneckloth,* the Mississippi Supreme Court declared that "[t]he words of our Mississippi Constitution are not balloons to be blown up or deflated every time, and precisely in accord with the interpretation the [United States] Supreme Court, following some tortuous trial, is constrained to place upon similar words in the U.S. Constitution."[278] According to the Mississippi Supreme Court, under article III, section 23 of the Mississippi Constitution, waiver of search and seizure rights "is defined as consent where the defendant knows that he or she has a right to refuse, being cognizant of his or her rights in the premises."[279]

**E. Washington State and Arkansas: Warning for Knock and Talk.** Two states provide that in order for consent in the context of a "knock and talk" to be valid, law enforcement must inform the subjects of their right to refuse the search. In *State v. Ferrier,* the Washington Supreme Court noted that any knock and talk is coercive to some degree.[280] "We would simply go further to state the obvious," the *Ferrier* court declared, "that the only sure way to give . . . protection substance is to require a warning of its existence."[281] Similarly, in *State v. Brown,* the Arkansas Supreme Court held that during a knock and talk, the state must

---

[277]*See Graves v. State*, 708 So. 2d 858, 863 (Miss. 1997) (en banc); *State v. Penick*, 440 So. 2d 547 (Miss. 1983).

[278]*Penick*, 440 So. 2d at 552.

[279]*Graves*, 708 So. 2d at 864.

[280]*State v. Ferrier*, 960 P.2d 927, 933 (Wash. 1998) (en banc).

[281]*Id.*

first inform the homeowner of his right to refuse consent.[282] A knock and talk, of course, is not the same factual context as a driver stopped on the road, but the reasoning of these cases tends to support a warning of some kind to support a waiver of constitutional rights.

**F. Alaska, Maryland, Minnesota, New Hampshire, North Carolina, and Ohio: Requirement of Independent Reasonable Suspicion to Permit Questioning Beyond Scope of the Traffic Stop.** The United States Supreme Court in *Rodriguez v. United States* has determined that while the duration of a traffic stop may not be extended to conduct an unrelated investigation, there are no limitations regarding the scope of the investigation while the traffic stop is being conducted.[283] Several states have rejected that approach and held that before police may pursue a consent search for drugs, there must be independent reasonable suspicion that a drug or other violation is occurring.[284]

**G. South Dakota and Texas: "Clear and Convincing Evidence."** The South Dakota Supreme Court has not required a *Miranda*-type warning in the context of consent searches; however, it requires that the state must establish "by clear and convincing evidence" that the search was a result of "free, intelligent, unequivocal[,] and specific consent without any duress or coercion,

---

[282]*State v. Brown*, 156 S.W.3d 722, 731–32 (Ark. 2004).

[283]*Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

[284]*Ferris v. State*, 735 A.2d 491, 499–500 (Md. 1999); *State v. Fort*, 660 N.W.2d 415, 418–19 (Minn. 2003) (en banc); *State v. McClendon*, 517 S.E.2d 128, 132 (N.C. 1999); *State v. McKinnon-Andrews*, 846 A.2d 1198, 1203 (N.H. 2004); *State v. Retherford*, 639 N.E.2d 498, 507 (Ohio Ct. App. 1994).

actual or implied."[285] Similarly, a court of appeals in Texas has held that in order to prove consent to search, the state must prove consent by "clear and convincing evidence."[286]

**VI. Iowa Law of Consent in Search and Seizure.**

There are several of our cases involving consent to search that bear on the questions posed in this appeal. As a general matter, as will be seen below, Iowa cases require a showing of particularity and that any claim of consent to a search must recognize the power dynamic between the police and the average citizen.

**A. *State v. Cullison*: Rejection of Socio-Juristic Reasoning and Recognition of Unequal Bargaining Power in Consent Context.** In *State v. Cullison*, we considered whether a parolee could be subject to a search of his home without a warrant.[287] We said no. We refused to dilute search and seizure rights based upon "socio-juristic rationalization, i.e., protection of the public."[288] Thus, the state's interest in obtaining convictions was not sufficient to support the state's proposed dilution of parolee rights. To permit such a broad rule that subjects parolees to discretionary searches was akin to the hated general warrant of the revolutionary era. Further, we rejected the notion that parolees' rights were dependent upon some kind of contract, pointing out that the power dynamic between the parties meant that "one side has all the bargaining

---

[285]*State v. Nemeti*, 472 N.W.2d 477, 478 (S.D. 1991).

[286]*State v. Ibarra*, 953 S.W.2d 242, 243 (Tex. Crim. App. 1997) (en banc).

[287]*State v. Cullison*, 173 N.W.2d 533, 535 (Iowa 1970).

[288]*Id.* at 536.

power."[289] The constitutional recognition of the need to avoid broad classes subject to discretionary police searches, as well as the recognition of the realities of the power dynamic in the context of consent, were themes repeated in our other cases.

**B. *State v. Ochoa*: Rejection of Impracticability as Eviscerating Warrant Requirement; Mere Acquiescence to Police is Not Consent.** In *State v. Ochoa,* we considered the continued validity of *Cullison* principles in the wake of innovations by the United States Supreme Court that dramatically cut back on search and seizure protections of parolees under the Fourth Amendment.[290] In *Ochoa*, the state sought to justify a warrantless search of a parolee when there was no claim of individualized suspicion.[291]

We refused to follow the eviscerating innovations of the United States Supreme Court that found getting a warrant impractical.[292] We repeated our often expressed endorsement of the warrant preference requirement, noting that "[w]e have repeatedly stated that warrantless searches and seizures that did not fall within one of the 'jealously and carefully drawn exceptions' are

---

[289]*Id.* at 537 (quoting *People v. Hernandez*, 40 Cal. Rptr. 100, 103 (Ct. App. 1964)).

[290]*Ochoa*, 792 N.W.2d at 285–86.

[291]*Id.* at 263–64.

[292]*Id.* at 281–83, 287–91 (discussing *Griffin v. Wisconsin*, 483 U.S. 868 (1987), *United States v. Knights*, 534 U.S. 112 (2001), and *Samson v. California*, 547 U.S. 843 (2006), and rejecting their approach in interpreting the Iowa Constitution).

unreasonable."[293] Instead, we stuck to our guns and required a warrant to support a search of a parolee.[294]

We did briefly consider the question of whether Ochoa had consented to the search.[295] We held that the mere acquiescence to a show of government authority was not sufficient to support the search in the case.[296]

**C. *State v. Pals*: At a Minimum, *Schneckloth* "With Teeth."** In *Pals v. State*,[297] we considered, among other things, the validity of consent to search by the driver of a vehicle who was seized by police on the open road, held in a police car, patted down for weapons, not told that he was free to leave, and who had surrendered his license to the officer.[298]

We extensively canvassed the caselaw and academic commentary related to the issue of consent to search in traffic stops, and ultimately found it sufficient to apply *Schneckloth* "with teeth." We noted that, at a minimum, the failure of the state to advise Pals that he was "free to go" was "a strong factor cutting against the voluntariness of the search, particularly in the context of a traffic stop where the individual is seized in the front seat of a police car."[299]

---

[293]*Id.* at 285 (quoting *State v. Strong*, 493 N.W.2d 834, 836 (Iowa 1992)).

[294]*Id.* at 291.

[295]*Id.* at 291–92.

[296]*Id.* at 292.

[297]*Pals*, 805 N.W.2d 767.

[298]*Id.* at 770–71.

[299]*Id.* at 783.

We reserved for another day the question of whether consent required knowing and intelligent waiver such as that required in *Johnson v. Zerbst*.[300] We declared we would insist on a stricter application of *Schneckloth* than under United States Supreme Court precedent. And yet, by adopting the multifactor approach, our decision in *Pals* did not establish clearer rules than *Schneckloth*. It merely synched up the application of the rules in a fashion more consistent with human psychology.

**D. *State v. Baldon*: Recognizing Disparate Power Relationships in the Context of Consent.** In *State v. Baldon*, we considered whether a parole agreement signed by a parolee as a condition of release could be considered the basis for voluntary consent under *Schneckloth*.[301] We held that such an agreement could not be considered the basis for voluntary consent.[302]

In our analysis, we canvassed the caselaw, noting that in a number of cases, courts "rejected consent derived from parole agreements as a theory for upholding searches" as a condition of parole because "such a condition is coercive and, therefore, involuntary."[303] We noted that in *Cullison*, we observed that the state "has all of the bargaining power" with respect to parole agreements.[304]

---

[300]*Id.* at 782.

[301]*Baldon*, 829 N.W.2d at 791.

[302]*Id.* at 803.

[303]*Id.* at 792–96.

[304]*Id.* at 796 (quoting *Cullison*, 173 N.W.2d at 537).

We further cited the LaFave treatise for the proposition that " 'the location and conditions' of even a brief detention may be such as to foreclose a finding of voluntary consent."[305] We concluded consent under all the circumstances "is not real."[306]

**E. *State v. Short*: Rejecting United States Supreme Court Precedents that Warrant Requirement was Impractical.** In *State v. Short,* we considered once again whether the warrant requirement applied to a search of a probationer's apartment under article I, section 8 of the Iowa Constitution.[307] In this case, however, the state asserted that although a warrant was not obtained, the state had reasonable suspicion that a crime had occurred.[308] We reaffirmed the principles of *Cullison,* rejected the notion that search and seizure protection should be diluted for parolees, and held that a warrantless search even with reasonable suspicion was invalid under the Iowa Constitution.[309]

In the analysis, we noted that the United States Supreme Court in a number of cases has suggested that it was "impracticable" to obtain a warrant to search the home of a parolee or probationer.[310] We rejected the notion that

---

[305]*Id.* at 798 (quoting 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 8.2(b) (5th ed. 2012)).

[306]*Id.* at 802.

[307]*State v. Short,* 851 N.W.2d 474, 481 (Iowa 2014).

[308]*Id.* at 478–79.

[309]*Id.* at 506.

[310]*Id.* at 497–99.

the alleged impracticality provided an exception to the warrant requirement.[311] We held that such notion "was wrong then and it is even more wrong today."[312]

**F. Summary.** Yes, the law moves slowly. Yet, the train of cases from *Cullison* to *Ochoa* to *Pals* to *Baldon* to *Short* shows a trend to recognize the strength of the warrant requirement and the need to recognize the reality of power dynamics in considering the question of consent. These cases set the stage for the consideration of questions raised in this case: whether the *Johnson v. Zerbst*-type approach should be applied, and, under the circumstances presented, whether specific warnings should be required.

**VII. Discussion.**

**A. Requirement of Knowledge of the Right to Refuse Consent.** In light of the above discussion, I certainly agree with Hauge that knowledge of the existence of the right to refuse consent is a necessary requirement for a so-called consent search. I come to this conclusion for several reasons. For starters, the general approach to "consent" in the search and seizure area, at least prior to *Schneckloth*'s innovations, was waiver. Waiver is the theory that works in the context of the surrender of a precious constitutional right: the right to be secure in your person, possessions, property, and home.

Further, the reengineering required to make consent an "exception" to the warrant requirement subject to the "reasonability" clause of article I, section 8 of the Iowa Constitution is illogical and cannot be justified. A decision regarding

---

[311]*Id.* at 505.

[312]*Id.*

whether to *surrender* a right has nothing at all to do with the *scope* of the underlying right. Instead, the question here is whether the holder of a precious constitutional right—namely Hauge—had decided to surrender the right and therefore give the state permission to search. If he knowingly and intelligently surrenders his right—the security in his person, property, and effects—such consent may pass the muster. Otherwise, the right to be secure from the state's desire to search and seize remains intact.

What the State wants to do in this case, as was true in *Schneckloth*, is take advantage of the ignorance of a person in order to conduct a search that they otherwise could not constitutionally conduct. In the State's view, the fact that Hauge was not informed of his constitutional right is a good thing that advances public policy. That is an extraordinary proposition. Justices Brennan and Marshall were mystified fifty years ago how the court could consider the unknowing surrender of a right "voluntary." I share their mystification fifty years later. I think it is clear under the record that the State failed to establish that Hauge knew he had the right to refuse the search.

**B. Requirement of Disclosure of the Right to Refuse.** Further, there is the question of whether we should require a simple warning, namely, that Hauge had a right to refuse consent and that any such refusal would be honored. There are clear advantages to requiring such a warning. It is often not clear under all the facts and circumstances whether a person has knowledge of their right to refuse consent. But, a requirement to inform a suspect of their rights gives rise to a simple factual issue that will ensure that a suspect has at last been informed

of their right to decline consent. This type of warning protected the Fifth Amendment rights in *Miranda*, and it would protect Fourth Amendment rights in this case.

The real question is what value a consent advisory would have if the empirical evidence shows that most persons consent to search anyway. Perhaps so, and yet, substantial logic and normative value require that one knowingly and voluntarily surrender constitutional rights.

The State declares in a conclusory fashion that requiring a warrant would be unduly burdensome. That is the same claim that was made in *Miranda*, and it has been proven without merit. Countless jurisdictions have utilized consent in a variety of forms. The State cannot simply declare that a process is "burdensome" and thereby overcome constitutional commands. If the mere incantation of "burdensome" is utilized, the burden plainly is on the State to show why this is so.

**C. Alternative Approach: *Schneckloth* with "Teeth."** A third basis for reversal is a straightforward application of the totality-of-the-circumstances test in *Pals*. One of the instabilities of *Schneckloth* is that it does not assign any weight to the factors, thereby permitting a summary of factors and a conclusion without any analysis. That is exactly what the majority does in this case. But, in *Pals*, we emphasized that the failure to provide disclosure of the right to dissent was a factor that should be "strongly" considered in the voluntariness analysis. Here, the officer explicitly stated that Hauge was not free to go. In *Ohio v. Robinette*, this factor would be dispositive under its *Schneckloth* with "teeth"

approach. At that point in time, Hauge had been removed from the vehicle and there was no basis to detain him. Hauge had the right to simply walk away. Nonetheless, the officers made clear to him that they were exercising coercive power over him and that he was not free to go.

The coercive power of law enforcement is plainly at work as he was seized— the officer was holding onto Hauge's driver's license. And, in light of what we know about human behavior, Hauge's testimony that he thought he had no choice but to submit to the show of authority certainly has the ring of truth. The fact that the officer was polite does not save the day for the State, as a person with clear authority often speaks in a soft voice.

Additionally, note the language. The officer asked him if he could "check [him] for weapons real quick." Although phrased politely, who would think the phrase was anything other than a statement of what the officer intended to do. "Yup" was simply an acknowledgment of the officer's plan.

**VIII. Conclusion.**

In summary, the best framework for evaluating surrender of constitutional rights is the waiver doctrine of *Johnson v. Zerbst.* The search and seizure protections of article I, section 8 of the Iowa Constitution are not secondary organs but are at the heart of our form of government. We should not seek a work-around to encourage the unknowing surrender of constitutional rights, and our government should not be in the business of obtaining convictions based upon a failure to recognize them. In order to ensure that the individual constitutional rights to be secure in their person, houses, papers, and effects, I

would require disclosure, similar but shorter than that required by *Miranda*, that a person has the right to refuse consent and that that right will be respected. Further, on the facts of this case, the State has failed to show waiver under the *Johnson v. Zerbst* formula. Further still, even applying the *Schneckloth* "with teeth" approach in *Pals*, the State has failed to meet its burden of showing "voluntariness."

For all of the above reasons, I would reverse the district court and remand the case for further proceedings.